COURT OF APPEALS OF VIRGINIA


Present:   Judges Humphreys, Haley and Alston
Argued at Alexandria, Virginia


CHARLES M. SANFORD

                                                              OPINION BY
v.        Record No. 0230-08-4                     JUDGE JAMES W. HALEY, JR.
                                                                JULY 14, 2009
COMMONWEALTH OF VIRGINIA


            FROM THE CIRCUIT COURT OF THE CITY OF ALEXANDRIA
                              John E. Kloch, Judge

            Paul E. Pepper, Deputy Public Defender (Office of the Public
            Defender, on brief), for appellant.

            Eugene Murphy, Senior Assistant Attorney General (Robert F.
            McDonnell, Attorney General, on brief), for appellee.


       Within Article 7 of Title 18.2 of the Code, "Criminal Sexual Assault," Code

§ 18.2 67.10(3) defines "Mental Incapacity" as "that condition . . . existing at the time of an

offense . . . which prevents the complaining witness from understanding the nature or

consequences of the sexual act involved . . . ."  Charles M. Sanford was convicted by the trial

court of *forcible* sodomy (cunnilingus), accomplished through the use of the victim's mental

incapacity, in violation of Code § 18.2-67.1(A)(2).  Sanford does not argue that the evidence is

insufficient to establish the act of sodomy.  Rather, he maintains the evidence is insufficient to

establish that incapacity.  We disagree and affirm.[1]

_____

       [1] The trial court found Sanford not guilty of three indictments charging forcible sodomy
(§ 18.2-67.1(A)(2)) (fellatio), carnal knowledge (§ 18.2-631), and indecent liberties
(§ 18.2-370.1).  Sanford was also convicted of aggravated sexual batter (§ 18.2-7.3(A))3)) but
Sanford's petition for appeal was denied with respect to that conviction.

I.

STANDARD OF REVIEW

Presented with a challenge that the evidence is insufficient, as here, we "presume the judgment of the trial court to be correct" and reverse only if the trial court's decision is "plainly wrong or without evidence to support it." Davis v. Commonwealth, 39 Va. App. 96, 99, 570 S.E.2d 875, 876-77 (2002). This presumption recognizes that the "trial judge's major role is the determination of fact, and with experience in fulfilling that role comes expertise." Haskins v. Commonwealth, 44 Va. App. 1, 11, 602 S.E.2d 402, 407 (2004) (citation omitted). Thus, an appellate court does not "ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 318-19 (1979) (emphasis in original and citation omitted). Our review does not authorize us to "reweigh the evidence." Nusbaum v. Berlin, 272 Va. 385, 408, 641 S.E.2d 494, 507 (2007). Rather, the appropriate appellate inquiry is "'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" Maxwell v. Commonwealth, 275 Va. 437, 442, 657 S.E.2d 499, 502 (2008) (quoting Jackson, 443 U.S. at 319) (emphasis in original).

II.

FACTS[2]

The female victim is sixteen years old and lived with her mother in Washington, D.C. The mother asked the child's father, Sanford, if the victim could stay with him for two to four days in Alexandria, Virginia. He agreed, and it was during this time period when the act of cunnilingus took place. When the victim returned home, she told her mother what had

---

[2] We see no need to identify the mother or the victim by name. We do note, however, that their surname is not the same as the defendant's.

happened,[3] whereupon the mother called the police and took the victim to the hospital. As noted, there is no challenge to the act of sodomy. Accordingly, we recite only those facts necessary for resolution of the issue raised, that is, the mental capacity of the victim. Neither the victim nor the defendant testified.

Dr. Gloria Morote qualified as an expert clinical psychologist. From her examination,[4] she concluded the victim had an IQ of 46, which she described as "very, very low" and "closer to the severe mental retardation range than the mild retardation range." Her other assessments included the following: "[I]n terms of verbal and visual memory functions, they are both in the impaired range, below the first percentile rank"; with respect to decision speed, "[I]t was below three years and four months . . . [t]hat was the floor of the test . . . [t]hat was the lowest score she could get." The victim's "[s]cores in terms of thinking ability, her thought processes, the visual motor speed . . . visual attention were . . . [all] . . . four years old . . . [and] . . . there was no score lower than that." Finally, with respect to the victim's non-verbal social reasoning, that is, as Dr. Morote described it, her "*ability to assess cause-effect relationships in social interaction . . . her score there was zero . . . the lowest.*" (Emphasis added).

Incorporating the above assessments with an interview with the child's mother, Dr. Morote evaluated the victim's adaptive skills. She defined the same as: "[c]ommunication skills, functional academics, health and safety, leisure, self-care, social [and] home living . . . ." The victim's score was 49, "which is consistent with the IQ score . . . ." That score, Dr. Morote opined, demonstrated that the victim "cannot live independently."

---

[3] The defendant's hearsay objection to the contents of this conversation was sustained.

[4] In her written evaluation, introduced as commonwealth's Exhibit 2, Dr. Morote noted that the victim during her interview did not know her last name, her full address, the name of her school, or the current day, month or year.

The victim's mother testified her daughter attends St. Coletta's of Greater Washington, a charter special education school. Regarding her adaptive functioning, she cannot read or write, though she can copy letters and recognize some numerals. She can, with help, dress herself and perform basic hygiene (brushing her teeth, etc.) when reminded to do so, but she is unable to wash or brush her hair. Her mother gives her birth control pills, but describes them to the victim only as vitamins. The victim cannot be left alone, either within or without the house, and requires constant adult supervision.

The mother testified she has told the victim about sex, in a general sense, advising her to wait "until she gets older . . . [to be] . . . thinking about having babies . . . ." However, the mother specifically stated she had never explained the physical act of sexual intercourse, the use of prophylactics or other methods of birth control, or the existence of sexually transmitted diseases. Further, the transcript includes the following:

> Q. Have you ever educated her on oral sex?
>
> A. No.

Katrice Ashton, a social worker at St. Coletta's, described the goal of the school to teach functional academics and "life skills." She testified that the victim could count from 1 to 25. She cannot read or write, but can copy a letter of the alphabet. She recognizes units of currency but cannot quantify them. She is "sometimes" able to tell time. They are attempting to teach her the meaning of symbols on signs, to enable her to cross a street safely. She needs prompting to wash her hands or brush her teeth. The victim "would love to play with stuffed animals all day if she could." She likes to pretend that she is Ms. Ashton's mother, and calls that teacher her "daughter." The victim has never had any sex education classes. For a period following the incident, the victim remained mute at school, refused to walk on her own, and pretended she was an animal, making various "animal noises."

Summarizing the victim's adaptive skills, Ms. Ashton testified as follows:

Q. What level of supervision does [the victim] require?

A. She requires constant supervision.

Detective Desiree Maxwell of the Alexandria Police Department interviewed the defendant. Detective Maxwell testified that the defendant told her he had only known the victim since she was a pre-teenager. He acknowledged, nonetheless, he knew the victim could not read or write, barely knew her numbers, had been told by her mother she was mentally retarded, agreed with the characterization that she acted "as about a five-year old," and put her clothes on backwards.

Though denying other sexual acts, he admitted he had performed cunnilingus on the victim. He claimed the victim was "talking about having babies in her tummy and boyfriend and girlfriend and being married." He maintained "[s]he would come on to [me] . . . asked [me] if [I] wanted to be her baby's daddy . . . ." Finally, he told the detective that the victim entered his bedroom wearing only a T-shirt just prior to the time the act of sodomy was performed.

It is his statements to Detective Maxwell, coupled with the testimony of the mother, summarized above, that the defendant maintains negate the substantiality of the Commonwealth's evidence to prove the mental incapacity of the victim to understand the nature or consequences of sodomy.

III.

ANALYSIS

In Adkins v. Commonwealth, 20 Va. App. 332, 457 S.E.2d 382 (1995), we reversed a rape conviction based upon mental incapacity. The victim was sixteen, mentally aged 10.4 years, with an IQ between 58 and 70. She was in the eighth grade at a public school. She could read and write, recording the defendant's telephone number in her address book. On the day of

the offense, she left her mother a note advising she was going to a mini-mart (where by agreement she purposely and surreptitiously met defendant). She could be left home alone, could travel and go shopping alone at a local mall, and, according to her mother, could take care of herself. She had had sex education classes at public school, and she understood that one could become pregnant or get AIDS *as a consequence* of sexual intercourse.

In reversing, we noted that a fact finder may not "infer from proof of general mental incapacity or mental retardation or an IQ range or mental age" *alone* that a victim lacks mental capacity.[5] Id. at 346, 457 S.E.2d at 389. Rather, "A person suffers from a 'mental incapacity' within the meaning of the statute, if he or she has a mental 'condition' that 'prevents' the person from being able to 'understand' *either* the 'nature' *or 'consequences'* of engaging in sexual intercourse." Id. at 344, 457 S.E.2d at 388 (second emphasis added).[6] We adopted the definition of "consequence" from Webster's Third New International Dictionary, at page 482: "'something that is produced by a cause or follows from a form of necessary connection or from a set of conditions: a natural or necessary result.'" Id. In short, IQ or mental age alone, while evidence of mental incapacity, does not necessarily establish that incapacity, within the meaning of the statute. Thus, the Commonwealth did not establish beyond a reasonable doubt that the victim in Adkins, though possessing limited IQ and a mental age less than her physical age, further did not understand either the nature or consequences of the sexual act. Indeed, the evidence demonstrated that she, in fact, had that understanding.

---

[5] Mental retardation (or subaverage intellectual functioning) is characterized by an IQ of seventy or below. See American Psychiatric Association, Diagnosis and Statistical Manuel of Mental Disorders 39 (4th ed. 1994).

[6] "'[M]ental incapacity' may extend to a transitory circumstance such as intoxication if the nature and degree of the intoxication has gone beyond the stage of reduced inhibition and has reached a point where the victim does not understand 'the nature or consequences of the sexual act.' Code § 18.2-67.10(3)." Molina v. Commonwealth, 272 Va. 666, 673, 636 S.E.2d 470, 474 (2006).

In White v. Commonwealth, 23 Va. App. 593, 478 S.E.2d 713 (1996), we again reversed a rape conviction based upon mental incapacity. The victim was educable mentally retarded. We noted, however, that the record showed that her achievement "[s]cores in communication, daily living skills and socialization domains were all above the mentally retarded range, with a strength in socialization skills, achievement, overall adaptive behavior falling well within the low average range." Id. at 597, 478 S.E.2d at 714. These are generally described as "adaptive skills."

It is the confluence of IQ (or mental age) *and* adaptive skills that are relevant to the establishment of mental incapacity. As one commentator has noted: "Intellectual functioning is measured by the intelligence quotient ('IQ'), which is obtained using standard intelligence tests. . . . Adaptive functioning includes an individual's social skills, communication skills, daily living skills, personal independence, and self sufficiency." Elizabeth J. Reed, Criminal Law and the Capacity of Mentally Retarded Persons to Consent to Sexual Activity, 83 Va. L. Rev. 799 (1997).

Initially, we note that a "fact finder is not required to believe all aspects of a defendant's statement or testimony; the judge or jury may reject that which it finds implausible, but accept other parts which it finds believable." Pugliese v. Commonwealth, 16 Va. App. 82, 92, 428 S.E.2d 16, 24 (1993) (citation omitted). As we held in Marable v. Commonwealth, 27 Va. App. 505, 509-10, 500 S.E.2d 233, 235 (1998): "[T]he fact finder is entitled to disbelieve the self-serving testimony of the accused and to conclude that the accused is lying to conceal his guilt." In accord with these principles, then, the trial court was at liberty to reject the defendant's statements to Detective Maxwell as to the circumstances preceding the act of sodomy.

Here, there is no question but that the victim is mentally retarded; her IQ is 46, her verbal, memory, and decisional functions are those of a four year old.

That being said, we address the victim's adaptive functions—what Dr. Morote described as "[c]ommunication skills . . . health and safety, leisure, self-care, social [and] home living" and what we characterized in White as "communication, daily living habits and socialization domains." Dr. Morote testified the adaptive skills score was 49, "consistent with the IQ score . . . ." The victim, Dr. Morote stated, "cannot live independently." The victim, according to Ms. Ashton, "requires constant supervision." The victim, consistent with her mother's testimony, cannot be left alone, within or without her home. This contrast between the victim's adaptive functioning, and those set forth in Adkins and White above, is striking, and telling.

As quoted above, Code § 18.2-67.10(3) defines mental incapacity as the inability to understand "the *nature* or *consequences* of the sexual act involved." (Emphasis added). Here, unlike Adkins or White, the sexual act is cunnilingus, not intercourse. While it is conceivable the victim could understand that sexual intercourse—even without understanding the mechanics of that act—could produce a baby, her mother specifically denied that she had ever discussed oral sex with her child, that is, the *nature* of that act. Furthermore, Dr. Morote testified that with respect to the victim's "ability to assess cause-effect relationships in social interaction" that is, the *consequences* of such interaction, "her score was zero . . . the lowest."

We conclude that the evidence was sufficient to establish that the victim lacked the mental capacity to understand the nature or consequences of the unchallenged act of sodomy.

Affirmed.