COURT OF APPEALS OF VIRGINIA


Present:   Judges Elder, Frank and Humphreys
Argued at Salem, Virginia


JAMES PAUL DESPER

                                                    MEMORANDUM OPINION[*] BY
v.        Record No. 2116-10-3                      JUDGE LARRY G. ELDER
                                                    NOVEMBER 8, 2011

COMMONWEALTH OF VIRGINIA


                FROM THE CIRCUIT COURT OF AUGUSTA COUNTY
                          Victor V. Ludwig, Judge

        Bruce D. Albertson (The Law Offices of Bruce D. Albertson, PLLC,
        on brief), for appellant.

        Karen Misbach, Assistant Attorney General (Kenneth T.
        Cuccinelli, II, Attorney General, on brief), for appellee.


        James Paul Desper (appellant) appeals from his bench trial convictions for three counts of

rape in violation of Code § 18.2-61 and one count of forcible sodomy in violation of Code

§ 18.2-67.1.  All convictions were based on appellant's use of the complaining witness' mental

incapacity.  On appeal, appellant argues the evidence was insufficient to prove (a) penetration

and (b) the complaining witness' mental incapacity and appellant's knowledge thereof.  We hold

the evidence of penetration was sufficient to support appellant's rape convictions but insufficient

to prove oral sodomy.  Thus, we reverse appellant's conviction for forcible sodomy and dismiss

the indictment.  We hold further that the evidence was sufficient to prove both the complaining

witness' mental incapacity and appellant's knowledge of that incapacity.  Thus, we affirm his

--------

[*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

convictions for rape by mental incapacity.  In sum, we affirm in part, reverse and dismiss in part, and remand with instructions.[1]

I.

"When the sufficiency of the evidence is challenged on appeal, 'it is our duty to consider [the evidence] in the light most favorable to the Commonwealth and give it all reasonable inferences fairly deducible therefrom.'"  Adkins v. Commonwealth, 20 Va. App. 332, 341, 457 S.E.2d 382, 386 (1995) (quoting Higginbotham v. Commonwealth, 216 Va. 349, 352, 218 S.E.2d 534, 537 (1975)).  The trial court's judgment will not be reversed unless "plainly wrong or without evidence to support it."  Id. at 341-42, 457 S.E.2d at 386.

A.  PENETRATION

A conviction for rape requires proof of the "essential element" of "[p]enetration . . . of a vagina" "by a penis."  Elam v. Commonwealth, 229 Va. 113, 115, 326 S.E.2d 685, 686 (1985).  Penetration is also "an essential element of the crime of sodomy."  Ryan v. Commonwealth, 219 Va. 439, 444, 247 S.E.2d 698, 702 (1978).

Here, appellant told Investigator Jenkins that he had sexual intercourse with S.D. three times.  "Sexual intercourse is defined 'as actual penetration to some extent of the male sexual organ into the female sexual organ.'"  Johnson v. Commonwealth, 53 Va. App. 608, 614 n.4, 674 S.E.2d 541, 544 n.4 (2009) (quoting McCall v. Commonwealth, 192 Va. 422, 426, 65 S.E.2d 540, 542 (1951)).  Thus, appellant's statement directly addressed the element of penetration required to prove rape.

In any criminal prosecution, the Commonwealth must prove the *corpus delicti*, "that is, the fact that the crime charged has been actually perpetrated."  Cherrix v. Commonwealth, 257 Va. 292, 305, 513 S.E.2d 642, 651 (1999).  Appellant correctly points to the principle that "the

---

[1] See infra footnote 5.

- 2 -

*corpus delicti* cannot be established solely by his uncorroborated statements." Jackson v. Commonwealth, 255 Va. 625, 645-46, 499 S.E.2d 538, 551 (1998). However, when an accused has fully confessed, "only slight corroboration . . . is required to establish *corpus delicti* beyond a reasonable doubt." Cherrix, 257 Va. at 305, 513 S.E.2d at 651. "It is not necessary . . . that there be independent corroboration of all the contents of the confession, or even of all the elements of the crime. The requirement of corroboration is limited to the facts constituting the *corpus delicti*." Watkins v. Commonwealth, 238 Va. 341, 348, 385 S.E.2d 50, 54 (1989). In addition, "corroborative facts supporting the *corpus delicti* may be furnished by circumstantial evidence as readily as by direct evidence." Id. at 349, 385 S.E.2d at 54.

Here, in addition to appellant's admission that he had "sexual intercourse" with S.D. three times, S.D. herself provided testimony sufficient to corroborate appellant's confession concerning the *corpus delicti* for the three rape convictions. S.D., too, testified they "had sex" three times. When asked to describe what that meant and what part of appellant's body touched hers, S.D. testified appellant put "[h]is 'thing,'" which she said was "between his legs," "*[i]n* mine." (Emphasis added). On appellant's motion to strike the Commonwealth's evidence, the trial court noted this testimony supported a finding that appellant "put his 'thingy' *in* her 'thingy' three times." (Emphasis added). S.D.'s testimony, regardless of whether it was precise enough on its own to establish penetration, was sufficiently precise to serve as the *slight* corroboration required to accompany appellant's admission that he had sexual intercourse with S.D.—i.e., penetrated her vagina with his penis—three separate times during the course of their afternoon together. See Powell v. Commonwealth, 267 Va. 107, 145, 590 S.E.2d 537, 560 (2004); Morning v. Commonwealth, 37 Va. App. 679, 685-87, 561 S.E.2d 23, 25-26 (2002).

As to appellant's conviction for forcible oral sodomy, however, we hold the evidence was insufficient to prove the requisite penetration. Appellant told Investigator Jenkins that he

- 3 -

performed "oral sex" on S.D. On similar facts in <u>Lawson v. Commonwealth</u>, 13 Va. App. 109, 113-14, 409 S.E.2d 466, 468-69 (1991), we reversed a conviction for oral sodomy based on a lack of evidence to prove penetration. In <u>Lawson</u>, it was the female victim, rather than the male defendant, who testified that the defendant "had sex with [her]" against her will on two occasions and "oral sex with [her]" on one occasion. <u>Id.</u> at 113, 409 S.E.2d at 468. Upon further questioning, the victim in <u>Lawson</u> defined "sex" to mean, as our case law does, that the defendant put "his penis inside [her] vagina," but she did not define what she meant by "oral sex." <u>Id.</u> at 113-14, 409 S.E.2d at 468. Because "no evidence established that [defendant Lawson's] lips or tongue made contact with the victim's vagina [or any other portion of the vulva] and no evidence was offered which equated oral sex with the meaning of [vaginal] sex as [the victim had] defined it [in her testimony]," we held in <u>Lawson</u> "that the essential element of penetration was not proved beyond a reasonable doubt." <u>Id.</u> at 114, 409 S.E.2d at 468.

Similarly, here, appellant was not asked to define "oral sex" or to indicate in any other way whether, when he performed "oral sex" on S.D., he penetrated "'any portion of . . . [her] female sexual organs.'" <u>Moore v. Commonwealth</u>, 254 Va. 184, 190, 491 S.E.2d 739, 742 (1997) (quoting <u>Love v. Commonwealth</u>, 18 Va. App. 84, 88, 441 S.E.2d 709, 712 (1994)). Thus, appellant's statement that he performed "oral sex" on S.D. was insufficient to establish the element of penetration for purposes of the sodomy charge. In addition, victim S.D. testified only that appellant put his mouth "*on* [her] 'thingy.'" (Emphasis added). Assuming the evidence was sufficient to establish S.D. used the word "thingy" to reference her female sexual organ, her use of the word "on" was nevertheless insufficient to establish penetration.

Thus, we reverse appellant's conviction for forcible sodomy and dismiss the indictment.

B. VICTIM'S MENTAL INCAPACITY AND APPELLANT'S KNOWLEDGE THEREOF[2]

Code § 18.2-61(A) provides that "[i]f any person has sexual intercourse with a complaining witness, whether or not his or her spouse, . . . and such act is accomplished . . . (ii) through the use of the complaining witness's mental incapacity or physical helplessness . . . , he or she shall be guilty of rape." "Mental incapacity" is defined as "that condition of the complaining witness existing at the time of an offense under this article which prevents the complaining witness from understanding the nature or consequences of the sexual act involved in such offense and about which the accused knew or should have known." Code § 18.2-67.10.

"The legislative purpose of Code § 18.2-61(A)(ii) is to protect persons who are mentally impaired or retarded from being sexually exploited due to their mental incapacity." Adkins, 20 Va. App. at 342-43, 457 S.E.2d at 387. "[W]hen an individual is mentally incapacitated under Code § 18.2-67.10(3), the individual is [considered] incapable of legally consenting to [various] sexual [acts], on the grounds that '[c]onsent without understanding is no consent at all.'" Nicholson v. Commonwealth, 56 Va. App. 491, 510, 694 S.E.2d 788, 797 (2010) (quoting Molina v. Commonwealth, 47 Va. App. 338, 358, 624 S.E.2d 83, 92, aff'd, 272 Va. 666, 636 S.E.2d 470 (2006)). We have recognized, "[h]owever, [that] such statutes must not be interpreted and applied in a manner that creates an unintended rule that would prohibit all mentally impaired or retarded persons from engaging in consensual sexual intercourse without having their partners commit a felony." Adkins, 20 Va. App. at 343, 457 S.E.2d at 387. In order to balance these objectives, "the legislature has chosen to protect [only] those mentally deficient persons whose mental condition prevents them from 'understanding the nature and consequences

---

[2] Because we have concluded appellant's forcible sodomy conviction must be reversed and the indictment dismissed, we examine appellant's remaining assignments of error only in reference to his three convictions for rape.

- 5 -

of the sexual act involved,'" id. (quoting Code § 18.2-67.10), and, in addition, it requires proof

that this condition is one "about which the accused knew or should have known," Code

§ 18.2-67.10.  Appellant challenges both prongs of the "mental incapacity" definition.

### 1.  Complaining Witness' Mental Incapacity

The first prong of the "mental incapacity" test is drafted in the disjunctive, requiring

proof that the "mental 'condition' [present is one] that 'prevents' the person from being unable to

'understand' *either* the 'nature' *or* 'consequences' of engaging in sexual intercourse."  Adkins,

20 Va. App. at 344, 457 S.E.2d at 388.  Construing the statute narrowly due to its penal nature,

we have concluded that it does not require a comprehension of "the more complex aspects of the

nature or consequences of sexual intercourse" and requires, instead, "a basic understanding of

the elementary and rudimentary nature and consequences of sexual intercourse."  Id. at 345, 457

S.E.2d at 388.  On that basis, we have set out the applicable test as follows:

> When a mentally impaired or mentally retarded person has
> sufficient cognitive and intellectual capacity to comprehend or
> appreciate that he or she is engaging in intimate or personal sexual
> behavior which later may have some effect or residual impact upon
> the person, upon the person's partner, or upon others, then the
> person does not have a "mental incapacity" within the meaning of
> the statute.  If a person is mentally incapacitated but, nevertheless,
> has the capacity to understand the nature and consequences of the
> sexual act, which understanding includes the capacity to make a
> volitional choice to engage or not engage in such act, then that
> person's sexual partner has not violated the rape statute merely
> because a mentally impaired person has made an unwise decision
> or has chosen to be sexually active.

Id. at 345-46, 457 S.E.2d at 388-89.  Elaborating on this test in Sanford v. Commonwealth, 54

Va. App. 357, 678 S.E.2d 842 (2009), we explained the relevant inquiry requires an assessment

of "the *confluence* of IQ . . . and adaptive skills . . . [, which] 'include[] an individual's social

skills, communication skills, daily living skills, personal independence, and self sufficiency.'"

Id. at 364, 678 S.E.2d at 845 (emphasis added) (quoting Elizabeth J. Reed, Criminal Law and the

- 6 -

Capacity of Mentally Retarded Persons to Consent to Sexual Activity, 83 Va. L. Rev. 799 (1997)).  Applying these principles in Sanford, we equated evidence of the victim's "'ability to assess cause-effect relationships in social interaction,'" a type of adaptive skill, with her ability to assess "the *consequences* of such interaction," id. at 365, 678 S.E.2d at 846, a component of the "mental incapacity" test.  Because expert testimony in Sanford indicated the victim's adaptive skills test score for her ability to assess cause-effect relationships in social interaction was "'zero . . . the lowest,'" we concluded the evidence supported the trial court's finding that she lacked the mental capacity to understand the consequences of the charged sexual act.  Id.

Here, S.D. specifically testified that although she did not resist appellant when he removed her clothing and engaged in sexual intercourse with her, she did not ask him to have sex with her, did not want him to do so, and did not run away or call 911 because she was in unfamiliar surroundings and "didn't have the guts."  The evidence further supported findings both that S.D. had a mental incapacity and that this incapacity prevented her from understanding the nature or consequences of engaging in sexual intercourse, thereby meeting the definition of "mental incapacity" in Code § 18.2-67.10.  Dr. Thomas Ryan, a board certified clinical psychologist, conducted twenty hours of testing and observation with S.D.  He evaluated her for mental retardation based on what he viewed as the more stringent of two accepted tests for such an assessment, the criteria contained in the Diagnostic and Statistical Manual of Mental Disorders.  Those criteria included an IQ below 70 and deficits in adaptive daily living skills.[3]  S.D. scored a 60 on the IQ test, which Dr. Ryan noted was well below the IQ cutoff point of 70.

---

[3] The third criterion Dr. Ryan identified as required for a diagnosis of mental retardation was the presence of these conditions before age 18.  Although proof of this criterion was not disputed in this case, the Supreme Court has noted that the definition of mental incapacity in Code § 18.2-67.10 does not require that the mental incapacity be permanent.  See Molina, 272 Va. at 673, 636 S.E.2d at 474 (holding "the term . . . may extend to a transitory circumstance such as intoxication" if severe enough to meet the definition in Code § 18.2-67.10(3)).

Dr. Ryan, in addition to testing and observing S.D. extensively himself, also collected relevant data from S.D.'s parents and teacher. He noted their reports coincided with his observations and indicated, based on tests normed against other impaired people, that S.D. fell in the "very-severely-impaired range on three out of four [adaptive] skills," including health and safety. He also testified, just as the expert in Sanford did, that he measured S.D.'s "ability to assess cause-and-effect relationships in a social interaction" and that her "score was zero."

Thus, here, just as in Sanford, the testimony supported a finding that S.D. had a mental incapacity which rendered her incapable of understanding the consequences of sexual intercourse. Indeed, S.D.'s testimony on the subject was limited to responding "yes" and "I guess" to leading questions about whether pregnancy could result from sex and could result from having sex "just one time." Although S.D.'s IQ of 60 and overall mental capacity of an eight year old was significantly higher than that of the victim in Sanford, who had an IQ of 48 and the overall mental capacity of a four year old, both IQ scores fell well below the cutoff score of 70 testified to by Dr. Ryan. Further, both victims, based on their zero scores on the adaptive skills test for measuring the ability to gauge cause and effect in social interactions, displayed a complete lack of ability to discern the consequences of their actions. As a result, the evidence here, as in Sanford, was sufficient to prove S.D. was "mental[ly] incapacit[ated]" as defined in Code § 18.2-67.10.

## 2. Appellant's Knowledge of Victim's Mental Incapacity

Convicting a defendant for rape in violation of Code § 18.2-61 based on the victim's mental incapacity also requires proof that the "mental incapacity . . . prevent[ing] the complaining witness from understanding the nature or consequence of the sexual act" was one "about which the accused knew or should have known." Code § 18.2-67.10(3). "Defendant can avoid liability only if neither . . . [knowledge] element is proved." State v. Olivio, 589 A.2d 597,

607 (N.J. 1991) (applying a similarly worded statute), <u>cited with approval in</u> <u>White v. Commonwealth</u>, 20 Va. App. 332, 343, 457 S.E.2d 382, 388 (1995).

"Specific intent is not required." <u>Olivio</u>, 589 A.2d at 607. The standard "knew or should have known" requires, instead, proof of criminal negligence. <u>Noakes v. Commonwealth</u>, 280 Va. 338, 346, 699 S.E.2d 284, 289 (2010). It is well established that to prove criminal negligence, the Commonwealth must prove "the conduct of the [accused] constitutes a great departure from that of a reasonable person (gross, wanton or willful conduct) which creates a great risk of [harm] to others and where by the application of an objective standard the accused should have realized the risk created by his conduct." <u>Keech v. Commonwealth</u>, 9 Va. App. 272, 280, 386 S.E.2d 813, 817 (1989). "Such a determination necessarily will be specific to the circumstances of each case and, thus, whether a defendant's conduct is criminally negligent is usually a question for the trier of fact, unless reasonable minds could not differ." <u>Carosi v. Commonwealth</u>, 280 Va. 545, 556, 701 S.E.2d 441, 447 (2010).

Assuming without deciding that limitations on a defendant's own mental capacity short of insanity may serve to negate a finding that he knew or should have known of the complaining witness' mental incapacity, the only reasonable inference flowing from the evidence presented at trial, viewed in the light most favorable to the Commonwealth, is that appellant had sufficient mental *capacity* himself that he knew or should have known S.D. suffered from a mental *incapacity* as defined in Code § 18.2-67.10(3).[4] Investigator Jenkins, who interviewed appellant at the police station, testified that appellant "seemed okay" to him and that he detected nothing in his dealings with appellant that led him to believe appellant "was in any way limited in his

---

[4] We note "mere knowledge of a mental *problem* does not equal knowledge of ['mental *incapacity*'] for purposes of the statute," <u>Olivio</u>, 589 A.2d at 607 (emphasis added), but conclude the Commonwealth met its burden of proof on this issue.

mental capacity." When S.D. had an argument with her father over whether she could continue to have contact with appellant via cell phone, appellant called S.D. and told her to "go in the woods and wait for him." Appellant, who resided over an hour away from S.D., was able to obtain directions to where S.D. lived and drive himself there, meeting S.D. at a nearby church. He was also able to hide her in the shed behind his mother's house, which he did because he knew his mother would not allow S.D. inside the house, and he was able to call a cab to take him and S.D. to a motel. The trial court made specific findings concerning "[appellant's] ability to discern the person with whom he was dealing." It noted the reasonable inference from the evidence was that appellant, who was twenty-six years old and had been in special education classes in school, merely had academic problems and that the evidence did not "indicate [appellant] had difficulty . . . assessing people." The court noted the evidence indicated appellant had married, had a child, and was "a functioning human being out there in real society," albeit "at the lower end of average [intelligence]." The evidence introduced in the guilt phase of the trial, in the light most favorable to the Commonwealth, supported these findings.

The evidence also supported a finding that, based on appellant's demonstrated level of ability and his opportunity to assess S.D's, he should have known of her mental incapacity as defined by Code § 18.2-67.10(3) by the time he had sex with her. Appellant communicated with S.D. "a lot" for over four months by telephone and text, during which he had an extensive opportunity to assess her communications skills and other abilities. Although they had not met in person until the day prior to the instant offenses, appellant spent approximately twelve hours in S.D.'s company at that time, most of which they spent alone, before the offenses occurred. The Commonwealth presented evidence that S.D., who was eighteen at the time of the charged offenses and at the time of appellant's trial, had an IQ of 60 and functioned on the level of an eight year old. Dr. Ryan testified that in terms of adaptive living skills, the victim fell in the

"very severely impaired range" in three of the four categories, including money management, home and transportation, and health and safety. He testified that "a person with this profile in independent adaptive living" would be "easily manipulated" and would respond positively to leading questions in order to "please[]" and "be liked," whether or not she understood them. He noted further, based on his observations of the victim in a videotape made when she was left alone in an interview room at the police station after the charged offenses, that her behavior of remaining in a fetal position for over an hour rather than asking to be released "really spoke to her lack of initiation" caused by her mental deficiency. Finally, Investigator Jenkins testified that when he interviewed the victim, she was "very blank" and "not interactive." The trial court found, based on its observations of S.D. in the courtroom and on the witness stand, that her behavior and demeanor were consistent with Dr. Ryan's testimony about her limitations. This evidence supported the trial court's finding that appellant either knew or should have known of S.D.'s mental incapacity by the time he removed her clothing and had sex with her on September 1, 2009.

The trial court's comment that "[i]f [S.D.] functioned with [appellant] the same way she functioned in this Courtroom, then I don't have any question but that he knew or should have known that she was not competent to agree to engage in sexual intercourse," does not compel a different result. Appellant points to language in White, in which we said as follows:

> Although the trial judge observed complainant at trial two years after the sexual act occurred and listed his observation of complainant as a reason to support his finding that, at the time of the offense, complainant was "mentally incapacitated[]" as required by Code § 18.2-67.10(3), the trial judge's observations are not sufficient to prove beyond a reasonable doubt that appellant was guilty of rape.

23 Va. App. at 596, 478 S.E.2d at 714. Appellant contends this statement renders the trial court's comment in this case similarly insufficient to prove criminal negligence. We disagree.

The Commonwealth's evidence concerning the mental incapacity of the fourteen-year-old victim in White was based on testing administered in October 1991 which indicated she was "'at the upper end of the educable mentally retarded range'" at that time, which was almost two years *prior* to the July 1993 offense. Id. at 597, 478 S.E.2d at 714. The Court in White also observed 1991 tests of the victim's "overall adaptive behavior [were stronger than her achievement scores and fell] well within the low average range." Id. Finally, the Commonwealth in White offered no other evidence that the victim "lack[ed] the ability to comprehend or appreciate either the distinguishing characteristics or physical qualities of the sexual act or the future natural behavioral or societal results or effects which may flow from the sexual act." Id. at 597, 478 S.E.2d at 715.

These facts stand in marked contrast to those in the instant case. Here, the victim was eighteen rather than fourteen at the time of the offenses, and trial occurred six months rather than two years afterward, making the trial court's observations at trial more relevant. Further, the Commonwealth presented extensive evidence of test results measuring S.D.'s mental incapacity which were conducted quite close in time to the charged offenses, within a few months rather than a few years. As previously recited, these test results showed that S.D.—in contrast to the victim in White, who had adaptive skills in the low average range—had very poor adaptive skills and a complete lack of ability to discern the consequences of her actions. Thus, here, unlike in White, the evidence was sufficient to support the trial court's finding that appellant "knew or should have known [the victim] was not competent to agree to engage in sexual intercourse."

III.

For these reasons, we hold the evidence was sufficient to support appellant's conviction for the three counts of rape, and we affirm these convictions. However, the absence of evidence

of penetration to prove oral sodomy requires that we reverse the forcible sodomy conviction and

dismiss the indictment for that offense.[5]

Affirmed in part,
reversed and dismissed in part,
and remanded with instructions.

---

[5] The sentencing order indicates the trial court sentenced appellant to twenty years for each of the four convictions. Although the order also indicates the court suspended sixty years of the total eighty-year sentence, the order does not state how the trial court allocated the suspended time among the four sentences. Thus, we are unable to determine from the sentencing order, based on our reversal of the forcible sodomy conviction, how much of appellant's remaining sixty-year sentence the trial court suspended. We note the transcript of the sentencing hearing indicates the trial court stated its intent was to suspend fifteen years of each twenty-year sentence. Because a court generally speaks only through its written orders, see, e.g., McBride v. Commonwealth, 24 Va. App. 30, 35-36, 480 S.E.2d 126, 128-29 (1997), we remand with instructions that the trial court enter an order clarifying the action it took at sentencing so that appellant's sentences for the convictions we affirm may properly be imposed. See Tatum v. Commonwealth, 17 Va. App. 585, 592-93, 440 S.E.2d 133, 138 (1994); see also Code § 8.01-428(B) (permitting correction of clerical errors); Davis v. Mullins, 251 Va. 141, 149, 466 S.E.2d 90, 94 (1996) (discussing court's authority under Code § 8.01-428(B) to correct the record to "speak the truth" by "placing upon the record evidence of judicial action *which has actually been taken* . . . at the proper time," as opposed to action "[the court] *might have [taken]*" but did not (emphases added)).