COURT OF APPEALS OF VIRGINIA

Present:   Judges Huff, Athey and Friedman
Argued by videoconference

CATHERINE ANN TOMLIN, A/K/A
 KATHY TOMLIN, A/K/A
 CATHY ANN TOMLIN, S/K/A
 KATHERINE ANN TOMLIN

                                                              OPINION BY
v.        Record No. 0561-21-3              JUDGE CLIFFORD L. ATHEY, JR.
                                                           MARCH 15, 2022
COMMONWEALTH OF VIRGINIA


                    FROM THE CIRCUIT COURT OF AUGUSTA COUNTY
                                   W. Chapman Goodwin, Judge

            Kieran Bartley, Assistant Public Defender, for appellant.

            Rosemary V. Bourne, Senior Assistant Attorney General (Mark R.
            Herring,[1] Attorney General, on brief), for appellee.


         Catherine Ann Tomlin ("Tomlin") was convicted in the Circuit Court of Augusta County

("trial court") of financially exploiting an incapacitated adult and of abusing or neglecting an

incapacitated adult.  On appeal, Tomlin makes three arguments:  (1) there was insufficient

evidence to prove that the victim was "mentally incapacitated" with respect to the financial

exploitation conviction; (2) there was insufficient evidence to prove that the victim suffered a

"serious bodily injury or disease" with respect to the abuse or neglect conviction; and (3) the trial

court improperly admitted hearsay during the trial.  For the following reasons, we affirm the

abuse or neglect conviction and reverse the financial exploitation conviction.


_____

        [1] Jason S. Miyares succeeded Mark R. Herring as Attorney General on January 15, 2022.

I. BACKGROUND

"[T]he evidence and all reasonable inferences flowing from that evidence [are viewed] in the light most favorable to the Commonwealth." *Pooler v. Commonwealth*, 71 Va. App. 214, 218 (2019) (quoting *Williams v. Commonwealth*, 49 Va. App. 439, 442 (2007) (*en banc*)).

Viewed in that light, the evidence reflects that Tomlin, who was in her fifties, and her mother, B.T., who was in her eighties, utilized B.T.'s Social Security benefits and Tomlin's income from her job at Walmart to pay for partially subsidized housing and other living expenses. The furniture in their apartment consisted of a high-backed chair, a futon, and a television. Tomlin slept on the futon, and B.T. slept in the chair. Although B.T. could go to the bathroom without assistance and wore Depends, she sometimes needed Tomlin's help to change them. B.T. also relied on Tomlin for food and transportation, and the daughter gave her mother sponge baths to address issues relating to personal hygiene. They had a joint bank account, but Tomlin established a separate account in 2019 so she could receive her pay from Walmart sooner.

Michelle Shank ("Shank") from the Shenandoah Valley Department of Social Services ("Department") interacted with the Tomlins from January to April of 2020. During the first three visits in January of that year, B.T. smelled strongly of urine and was offered services, including assistance in securing a hospital bed, a Medicaid application, and in-home rehabilitative and general services. Tomlin and her mother rejected those services. Believing B.T. was mentally competent, Shank closed her investigation on January 20, 2020. Tomlin was referred to the Department again in February as a result of B.T.'s immobility and swollen legs. Shank visited with the Tomlins three or four more times in March of 2020 and secured two mattresses for them. Shank offered the same services as she had in January, but Tomlin refused all assistance,

claiming that she was maintaining her mother's hygiene through sponge baths and by changing her Depends regularly.

On April 22, 2020, B.T. fell. Two days later, a pest control worker encountered Tomlin and B.T. in the apartment and called 911 to report that an elderly woman was lying on the floor, covered in bed bugs, and requiring medical attention. Firefighter Andrew Tanner ("Tanner") responded to the call in a county ambulance.

At trial, Tanner testified that he and his coworker entered the apartment to find Tomlin standing in the kitchen doorway and B.T. lying on the living room floor "on her left side[,] covered in feces and urine, [with] what looked to be bed bugs crawling on her." Tanner also noted that her clothing and Depends were "well over saturated" with urine and that feces were all over B.T., her clothes, and the floor. Tomlin admitted that B.T. had been on the floor since her fall two days before and when asked why she had not cleaned B.T. up, she replied that she "did not have time." B.T. was placed on a stretcher and taken to the hospital, complaining of hip pain.

When she arrived at the emergency room, Physician's Assistant Tyler Prewitt ("Prewitt") examined her. At trial, Prewitt was qualified as an expert in "diagnosing wounds . . . [and] bed sores . . . in an emergency department." He found her condition as follows: "a very uncommonly large amount of feces" and urine on her body and so many bed bugs that some fell to the floor. He testified that she was covered in "a noteworthy amount of stool and urine . . . essentially from head to toe." Prewitt later clarified that B.T. had feces at least "from toe to neck."

Prewitt further testified that although B.T. had no "acute injuries," her condition included bed bug bites and bed sores (ulcers). She had "moderate" bed sores below the buttocks, one five and a half centimeters by one and a half or two centimeters and another three centimeters by one

centimeter. Prewitt testified that some parts of these bed sores had passed the dermis and approached the fascia, indicating an increased risk of infection. Prewitt doubted that these sores were infected at that time but testified that additional sores on a lower part of her legs might have been. He believed the bed sores had been developing for at least one week.

Prewitt also testified that B.T.'s risk of death from infection was serious if left untreated, but he admitted the ulcers would not have killed her directly and that she was not at risk of imminent death. He also testified that the risk of infection from a bed sore was significant. In addition, the ubiquitous urine and the fecal matter covering close to fifty percent of her body had greatly increased her risk of infection during the time she lay on the floor. B.T.'s "indifference to the amount of stool and dishevelment" and her bed sores concerned Prewitt because it indicated a "level of confusion." B.T. was aware of what was happening around her, but not the day of the week or who was President. Prewitt had her admitted to the hospital for further diagnosis and treatment. After being discharged, B.T. died in hospice care in June of 2020. There was no testimony directly bearing on B.T.'s mental capacity from the time she was admitted to the hospital to the time of her death approximately two months later.

Shortly after B.T. entered the hospital, Tomlin was evicted from their apartment. She lived in a motel for eighty dollars per day and used B.T.'s Social Security money to pay for the room and other necessities. B.T. did not consent to this use of her money. While under cross-examination, Shank was asked why she did not inquire about Tomlin's use of B.T.'s money during the first days of B.T.'s hospital stay in April. Shank responded that she was focused on B.T.'s medical condition because her "prognosis was poor." Asked to clarify, Shank said the hospital told her that B.T.'s prognosis was poor. Tomlin's counsel objected to Shank's response as hearsay, but the trial court ruled that he could not object to an answer to his own question.

Tomlin moved to strike the Commonwealth's evidence on both charges, and her motion was denied. The trial court subsequently convicted Tomlin of misdemeanor financial exploitation of a mentally incapacitated adult and felony abuse or neglect of an incapacitated adult. The trial court reasoned that a person lacks the mental capacity to consent to have her "only assets" used "for somebody else's benefit when [the person does not] have the ability to recognize [she has] sores that could lead . . . to [her] death." The trial court also concluded that the bed sores qualified as "serious bodily injuries" because they "could lead to death," had a significant impact on B.T.'s health, and were unlikely to be properly attended to by Tomlin had B.T. been released.

## II. STANDARD OF REVIEW

"[W]e interpret the Code *de novo*." *Hutton v. Commonwealth*, 66 Va. App. 714, 719 (2016) (citations omitted). In a sufficiency case, although we "review *de novo* the trial court's application of defined legal standards to the particular facts of the case," *Trent v. Commonwealth*, 35 Va. App. 248, 250 (2001) (citation omitted), we defer to the trial court's factual findings unless they are "plainly wrong or without evidence to support [them]," *Pijor v. Commonwealth*, 294 Va. 502, 512 (2017) (quoting Code § 8.01-680). The trier of fact is required "to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Brown v. Commonwealth*, 68 Va. App. 44, 55 (2017) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). There was sufficient evidence if "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Dietz v. Commonwealth*, 294 Va. 123, 132 (2017) (quoting *Bowman v. Commonwealth*, 290 Va. 492, 496-97 (2015)). Just because another trier of fact "might have reached a different conclusion" about what the evidence showed does not mean that this "[C]ourt [can] say that the evidence does or does not establish [the defendant's] guilt beyond a reasonable

doubt." *Commonwealth v. Perkins*, 295 Va. 323, 327 (2018) (first alteration in original) (quoting *Cobb v. Commonwealth*, 152 Va. 941, 953 (1929)).

III. ANALYSIS

A. Financial Exploitation of a Mentally Incapacitated Adult

Tomlin argues the evidence was insufficient to convict her of financially exploiting an incapacitated person in violation of Code § 18.2-178.1. Specifically, she argues that the trial court had insufficient evidence to find beyond a reasonable doubt that B.T. suffered from "mental incapacity" as defined by Code § 18.2-178.1(D). At its core, Tomlin's argument is that evidence establishing B.T.'s mental incapacity with respect to her healthcare decisions cannot justify the trier of fact's conclusion that her mental incapacity extended to financial matters. We agree.

Pursuant to Code § 18.2-178.1(A), a person is guilty of larceny if she uses another person's mental incapacity to "take, obtain, or convert money or other thing of value belonging to that other person with the intent to permanently deprive him thereof." Subsection (D) defines "mental incapacity" as "that condition of a person existing at the time of the offense . . . that prevents him from understanding the nature or consequences of the transaction or disposition of money or other thing of value involved in such offense." The mental incapacity must exist "at the time of the offense." *White v. Commonwealth*, 68 Va. App. 241, 249 (2017).

"[P]roof of general mental incapacity or retardation or an IQ range or mental age" cannot prove that "a victim is prevented or unable to understand the nature and consequences of a sexual act . . . ." *Adkins v. Commonwealth*, 20 Va. App. 332, 346 (1995). In *Adkins*, the Commonwealth had to provide evidence probative of the victim's inability "to comprehend or appreciate either the distinguishing characteristics or physical qualities of the sexual act or the future natural behavioral or societal results or effects which may flow from the sexual act." *Id.*

Hence, *Adkins* stands for the proposition that, where a criminal statute expressly requires that the mental incapacity of a victim of the crime extend to a specific subject matter, proof of the victim's general mental incapacity cannot justify the trier of fact in concluding that the victim's mental incapacity extends to the required subject matter.[2] *Id.*; *White v. Commonwealth*, 23 Va. App. 593, 597 (1996); *see Sanford v. Commonwealth*, 54 Va. App. 357, 363-65 (2009) (relying on an expert's testimony that the victim lacked the ability to understand social interactions and the victim's mother's testimony that the victim had not been told about the nature of the sexual act); *Clark v. Arizona*, 548 U.S. 735, 745 (2006) (recounting that a defendant's insane delusions made him believe police officers were aliens but did not prevent him from understanding that bullets can be used to kill animate beings).

If proof of a crime victim's general mental incapacity by itself cannot justify the trier of fact in concluding that the incapacity extends to a particular subject matter, then proof of mental incapacity with respect to a particular subject matter cannot, by itself, justify the trier of fact in concluding that the victim's mental incapacity extends to another, unrelated subject matter. This principle applies to lay testimony as well as expert testimony which does not expressly draw a connection between the victim's general or partial mental incapacity and their mental incapacity with respect to the particular subject matter specified in the relevant statute.[3]

Therefore, evidence that B.T. was mentally incapacitated with respect to healthcare decisions could not, by itself, justify the trial court in finding beyond a reasonable doubt that she

---

[2] There is an exception not relevant here: evidence of severe intoxication can demonstrate that mental incapacity extends to a particular subject matter. *See Molina v. Commonwealth*, 272 Va. 666, 674 (2006).

[3] Prewitt was not qualified at trial as an expert in diagnosis or treatment of mental illness. Even if he had been so qualified, he offered testimony only on her general mental capacity and her mental capacity with respect to healthcare decisions. He did not testify to any conclusions he formed regarding her mental capacity with respect to financial matters.

was also mentally incapacitated with respect to financial matters. The record contains no evidence that specifically addresses B.T.'s mental capacity in financial matters. The trial court based its decision about her inability to understand financial matters on evidence of her inability to understand her healthcare needs: "I don't think that [an] incapacitated person can give consent to use their only assets for somebody else's benefit when they don't have the ability to recognize they have sores that could lead . . . to their death." Furthermore, Prewitt's testimony regarding B.T.'s "level of confusion," if taken by the trial court as evidence of general mental incapacity, falls squarely under the *Adkins* rule. Therefore, the trial court erred in finding there was sufficient evidence to convict Tomlin of financial exploitation of an incapacitated adult.

### B. Abuse or Neglect of an Incapacitated Adult

Tomlin also argues that the evidence adduced at trial, even in the light most favorable to the Commonwealth, was insufficient to convict her of abuse or neglect of an incapacitated adult that caused serious bodily injury. Code § 18.2-369(A) makes it "unlawful for any responsible person to abuse or neglect any incapacitated adult." Subsection B provides that abuse or neglect that "results in serious bodily injury or disease to the incapacitated adult" is a "Class 4 felony." Subsection C defines "abuse," "neglect," "responsible person," "incapacitated adult," and "serious bodily injury or disease." Tomlin does not challenge the trial court's finding that she was a responsible person or the finding that her failure to properly care for B.T. amounted to neglect and caused B.T.'s physical condition. She challenges only the trial court's determination that B.T. suffered a "serious bodily injury or disease," arguing that B.T.'s condition when admitted to the hospital was not sufficiently serious. We disagree.

"Serious bodily injury or disease" includes but is not "limited to (i) disfigurement, (ii) a fracture, (iii) a severe burn or laceration, (iv) mutilation, (v) maiming, or (vi) life-threatening internal injuries or conditions, whether or not caused by trauma." Code § 18.2-369(C). Tomlin

argues that an injury, disease, or condition must imminently threaten near-certain death to be sufficiently serious and that an injury, disease, or condition cannot be sufficiently serious if the victim is expected to recover with proper treatment. Tomlin's sufficiency challenge requires us to interpret "serious bodily injury or disease" *de novo* and then determine whether the trial court was plainly wrong in deciding that the evidence showed that B.T.'s condition was a serious bodily injury or disease within the meaning of the statute.

Our Supreme Court applied Code § 18.2-369(C) in *Correll v. Commonwealth*, 269 Va. 3 (2005). In *Correll*, emergency personnel transported an elderly woman to the hospital for treatment. *Id.* at 8. She was severely dehydrated and undernourished and had been so for at least several weeks. *Id.* at 8-9. She also suffered from "stage 3 and early stage 4 decubiti," or bed sores. *Id.* at 8. The doctor testified the bed sores must have taken more than two days to develop, a nurse testified she believed they had developed over a month or longer, and another nurse testified that they must have taken weeks to develop. *Id.* at 9. The elderly woman also had a condition in which "bacteria [were] present in the blood," and the doctor testified this showed "that the [bed sores] had not been treated properly." *Id.* Twenty-two days after being discharged to a nursing home, she was readmitted with pneumonia and died shortly thereafter. *Id.* at 10. A forensic pathologist testified that she was "extremely emaciated" and had been in "a state of chronic starvation." *Id.* The doctor testified that her conditions "imposed a significant threat to her life or health." *Id.* at 14.

We have held that the ordinary meaning of "serious bodily injury" is central to interpreting Code § 18.2-369(C). *Brewster v. Commonwealth*, 23 Va. App. 354, 357-58 (1996) (holding that the statute was not unconstitutionally vague because "serious bodily injury" is both reasonably understandable and is a part of Virginia's legal vocabulary). "Because the Code of Virginia is one body of law, other Code sections using the same phraseology may be consulted in

determining the meaning of a statute." *Newton v. Commonwealth*, 21 Va. App. 86, 90 (1995) (quoting *Branch v. Commonwealth*, 14 Va. App. 836, 839 (1992)). In *Nolen v. Commonwealth*, 53 Va. App. 593 (2009), we discussed the ordinary meaning of "serious" and "bodily injury" in the context of Code § 16.1-253.2, which prohibits violating a protective order and provides for increased penalties when the violation causes serious bodily injury.[4] According to *Nolen*, "[b]odily injury comprehends . . . *any bodily hurt* whatsoever." *Id.* at 598 (quoting *Bryant v. Commonwealth*, 189 Va. 310, 316 (1949)). Such bodily hurt is "serious" if it is "grave in . . . appearance" or "requir[es] considerable care." *Id.* (first alteration in original) (quoting *Webster's Third New International Dictionary* 2073 (1981)). "Serious" bodily hurts are those which are "not trifling[, but instead are] grave [and] giv[e] rise to apprehension[, or are] attended with danger." *Id.* at 599 (quoting *Commonwealth ex rel. Lamb v. Hill*, 196 Va. 18, 23 (1954)).

Tomlin's counsel argued on brief and at oral argument that an injury, disease, or condition needs to threaten imminent death in order to be sufficiently serious and that a condition not expected to lead to death if properly treated is not sufficiently serious to fall within the meaning of the statute. That is a very narrow approach to "serious bodily injury or disease." We reject it for several reasons.

First, the statute lists several categories of injuries that are not necessarily life-threatening but are nevertheless serious. Disfigurements, bone fractures, and even mutilations and maimings are not invariably, imminently life-threatening, yet they are included in the non-exhaustive list of specific categories of serious bodily injuries or diseases in Code § 18.2-369(C). In fact, many

---

[4] At the time *Nolen* was decided, Code § 16.1-283(E), which provides for termination of parental rights, defined "serious bodily injury" as "bodily injury that involves substantial risk of death, extreme physical pain, protracted and obvious disfigurement, or protracted loss or impairment of the function of a bodily member, organ or mental faculty." *Nolen*, 53 Va. App. at 597 (quoting Code § 16.1-283(E)). The *Nolen* Court rejected that definition because, "[b]y its terms, it applies only to Code § 16.1-283(E)." *Id.* We reject it here for the same reason.

- 10 -

bone fractures are expected to fully heal with proper treatment. Severe lacerations sometimes leave nothing more than a scar after appropriate treatment and time to heal.

Second, an injury, disease, or condition can be life-threatening yet not cause certain and impending death. It is true that a small paper cut is not a serious bodily injury even though, if untreated, there is a remote chance it could become infected and the infection could lead to death. Conversely, terminal cancer is life-threatening even though there is a marginal chance that an experimental drug could save the patient. It is a matter of degree. The higher the risk of death, the more the injury, disease, or condition can be said to actually threaten the injured person's life. For an injury, disease, or condition to be life-threatening, it must present a real, appreciable risk of death, but need not create a likelihood of imminent, near-certain death.

In light of the foregoing, we conclude that the trial court did not err when it decided that B.T. suffered from a "life-threatening . . . condition," and therefore a serious bodily injury or disease as defined in the statute. Prewitt testified that he was not sure if B.T.'s bed sores were infected but there was a significant risk of infection if not properly treated and that an infection might very well kill B.T. In particular, he indicated that parts of these bed sores had passed the dermis and approached the fascia, indicating an increased risk of infection. Although he doubted the bed sores immediately below her buttocks were infected, he testified that the sores on a lower part of her legs might have already been infected. Prewitt felt it important to have her admitted to the hospital for treatment as a result of her condition.

The risk of infection (and ultimately, of death) was a result of her neglected condition, which included being covered by bed bugs, urine, and feces. In this case, although Tomlin assured the case worker that she would change her mother's Depends and give her regular sponge baths, Tomlin failed to do so because she "didn't have time." As a result of this neglect,

- 11 -

the likelihood of infection and eventual death was at its highest during the two days she lay on the floor covered in bed bugs and her own waste.

The evidence was therefore sufficient for the trial court to conclude that B.T.'s bed sores presented a risk of death significant enough to make them a "life-threatening . . . condition." Although Tomlin argues the bed sores were treatable, B.T. lay in her own filth for two days without any treatment or cleaning. Her condition was life-threatening because of the combination of bed sores, leg sores, and the increased risk of infection created by the ubiquitous bed bugs, feces, and urine covering her body. *See Correll*, 269 Va. at 6-11, 14 (holding that bed sores combined with other medical problems and risk factors, including infection, can be a "life-threatening . . . condition"). Therefore, the trial court had sufficient evidence to convict Tomlin of violating Code § 18.2-369(C).

### C. Hearsay

On appeal, evidentiary rulings are reviewed for abuse of discretion. *Jones v. Commonwealth*, 71 Va. App. 70, 85 (2019) (citing *Blankenship v. Commonwealth*, 69 Va. App. 692, 697 (2019)). A court has abused its discretion if its decision was affected by an error of law or was one with which no reasonable jurist could agree. *Grattan v. Commonwealth*, 278 Va. 602, 620 (2009) (citing *Porter v. Commonwealth*, 276 Va. 203 (2008)); *Jones*, 71 Va. App. at 86 (citing *Lawlor v. Commonwealth*, 285 Va. 187, 212-13 (2013)).

While cross-examining Shank, Tomlin's attorney asked Shank a question that elicited hearsay from Shank. Tomlin's attorney promptly objected, was overruled, and noted his objection to the ruling on the record. The trial court held that Shank's answer was hearsay but was admissible because Tomlin's attorney elicited it. On appeal, Tomlin argues that inadmissible hearsay is not rendered admissible merely because a witness presented it in response to the objecting party's question. In response, the Commonwealth argues that the

statement was not hearsay because it was admissible to prove "why Shank did not speak to B.T. after she was in the hospital" or in the alternative, as the court ruled, that Tomlin's attorney invited the hearsay.

Assuming without deciding the trial court's decision was error, the error was harmless. The admission of evidence contrary to Virginia's evidence law is harmless if the appellate court "can[] say, with fair assurance, . . . that the judgment was not substantially swayed by the error." *Commonwealth v. Swann*, 290 Va. 194, 201 (2015) (quoting *Anderson v. Commonwealth*, 282 Va. 457, 467 (2011)). At oral argument, Tomlin's counsel conceded that if this Court adopted a less stringent definition of "serious bodily injury" than the one he advocated, the error was likely harmless. He believed the statement was necessary to convict Tomlin under his definition of serious bodily injury as life-threatening injury, but he admitted that the statement was likely not necessary to convict Tomlin under a broader definition. As discussed *supra*, we rejected Tomlin's stringent definition in favor of a broader definition.

After a mature consideration of the entire record, we conclude that Shank's statement did not "substantially sway" the trial court. The Commonwealth did not mention Shank's response in closing arguments and the trial court did not mention it during its ruling, but instead relied expressly on Prewitt's testimony. As explained above in detail, there was ample evidence from which to conclude that B.T. had suffered a serious bodily injury: the size and depth of the bed sores, the risk of infection leading to death, the ubiquitous feces and urine increasing that risk of infection, and the bed bug bites. Shank's statement was less than a cherry on top. Therefore, we hold that any error was harmless.

IV. CONCLUSION

First, the trial court lacked sufficient evidence to conclude that B.T. was mentally incapacitated with respect to financial matters. Second, it had sufficient evidence to conclude that B.T. had suffered "serious bodily injuries." Third, even if the trial court improperly admitted hearsay during Shank's testimony, the error was harmless. Accordingly, we reverse and dismiss with respect to the conviction for financial exploitation of a mentally incapacitated adult, but we affirm the conviction for abuse or neglect of an incapacitated adult.

*Affirmed in part, reversed and dismissed in part.*