Present:   All the Justices

SHIRLEY P. CORRELL

                OPINION BY CHIEF JUSTICE LEROY R. HASSELL, SR.
v.  Record No. 040746              January 14, 2005

COMMONWEALTH OF VIRGINIA

            FROM THE COURT OF APPEALS OF VIRGINIA

                            I.

    Shirley P. Correll was indicted by a Bedford County grand jury for the murder of her incapacitated mother, Nellie S. Paxton, and felonious abuse or neglect of Paxton that resulted in serious bodily injury or disease to her in violation of Code §§ 18.2-33 and -369.  At the conclusion of a bench trial, the circuit court acquitted Correll of the murder charge, but convicted her of felony neglect.[1]  The court fixed her punishment at two years in the penitentiary, suspended upon the service of 30 days in jail.  The Court of Appeals affirmed the judgment of the circuit court, Correll v. Commonwealth, 42 Va. App. 311, 591 S.E.2d 712 (2004), and Correll appeals.  Correll challenges the sufficiency of the evidence to sustain the conviction.

                            II.

_____

    [1] At the conclusion of the guilt phase of the trial, Correll retained a different attorney to represent her during the sentencing phase and on appeal.  Her new attorney requested that the circuit court consider additional evidence not presented during the guilt phase of the trial.  The circuit court denied this request.

Applying well-established principles of appellate review, we will consider the evidence and all reasonable inferences fairly deducible therefrom in the light most favorable to the Commonwealth, the prevailing party below.  Zimmerman v. Commonwealth, 266 Va. 384, 386, 585 S.E.2d 538, 539 (2003); Phan v. Commonwealth, 258 Va. 506, 508, 521 S.E.2d 282, 282 (1999).

Nellie Paxton lived in Bedford County.  In 1991, she began to lose weight, and she refused to eat.  Dr. Donald B. Nolan, a neurologist, examined Paxton that year.  Six months before her visit with Nolan, Paxton had experienced episodes of confusion, "had passed out, and a CAT scan had shown that she had possibly had a right-sided, right hemisphere stroke." When Dr. Nolan examined her, he "was alarmed at her general appearance."  He suggested that a physician who practices internal medicine examine Paxton.  She was examined and admitted to a hospital for treatment for weight loss and anemia.  Paxton's condition improved, and she gained weight. Paxton was able to conduct her affairs.

In 1992, Dr. Nolan noted that Paxton "began to show signs of Parkinson's disease."  She also began to experience hallucinations, and she may have had a form of dementia "which mimics Alzheimer's and has Parkinson's as part of it."

Dr. Nolan did not monitor Paxton's nutritional status. However, he testified that: "She always looked terrible. She just was emaciated. And her appearance, that's just her. It was her normal body habitus, I suppose. [Her physicians] really never found a good cause for why she had lost the weight when I first saw her. She was just a very skinny, thin lady."

In 1997, Shirley Correll was appointed by the circuit court as the legal guardian for her mother. That same year, Paxton fell and broke her hip. She was admitted to a hospital for treatment. The medical personnel who treated Paxton explained to Correll and her sister, Carol P. Gray, that Paxton "would need to be up and moving and not lying in bed" to prevent complications such as pneumonia and decubiti.

Between 1997 and February 2000, Paxton continued to lose weight. In January 2000, Dr. Adel Salama, a physician who practices internal medicine, examined and treated Paxton. He diagnosed her condition as advanced Parkinsonism, multi-infarct dementia, hypertension, atrial fibrillation, osteoarthritis, along with early stage 2 decubiti. Dr. Salama described decubiti, commonly referred to as bedsores, as follows:

> "Decubiti is a break in the layer of the skin. And there are four stages. One stage, first stage is just redness in the skin. . . . [w]hich when you

3

push on it, it does not blanch. Stage 2, early Stage 2 is a breakdown in the skin layers. It can involve the epidermis, which is a superficial layer of the skin, or it can go down to the dermis, which is a deeper layer of the skin. Or Stage 3 is involving the subcutaneous tissue under the skin. And Stage 4 is involving down to the bone."

Paxton had one stage 2 decubitus that was located on her lower back.

Dr. Salama prescribed the use of a Duoderm patch to treat the decubitus. The Duoderm patch is a hydrochloride material that is placed on the decubitus and helps the regeneration of the skin cells. Dr. Salama spoke with Correll regarding the care and health needs of Paxton, who was predisposed to decubiti.

In January 2000, Dr. Salama did not observe any physical signs or symptoms that indicated to him that Paxton was malnourished. Her albumin was checked on January 17, 2000. Paxton's albumin level was in the normal range of 3.8 to 5.2. According to Dr. Salama, Paxton's albumin level indicated that she had a "good nutritional status."

Dr. Salama told Correll to bring Paxton to his office for another examination "[i]n six months. Earlier, if there is any problem." Dr. Salama testified that he would have expected to examine Paxton sooner than six months if Paxton "lost more weight, if the decubiti is not getting better, and so on." Even though Dr. Salama's office made an appointment

4

for him to examine Paxton in July 2000, "[t]hey called and cancelled it."  Dr. Salama stated:  "I don't know who called because I'm not the one who cancelled the appointment."

Carol Gray, who was estranged from her sister, Correll, saw her mother in February 2000.  Gray stated that Paxton "looked worse.  She lost a lot more weight."  When Gray saw her mother on Mother's Day in May 2000, Paxton had "lost more weight. . . .  She was beginning to really look bad."  Gray saw her mother again in August 2000.  "She just had really lost down until she was – looked like a skeleton.  You know, she was just really small."  Gray next saw Paxton at a wedding in September 2000.  Her mother's condition had worsened.

On September 18, 2000, Correll made a telephone call to Dr. Salama's office.  Correll was very concerned about Paxton's condition, and Dr. Salama's employees scheduled an appointment for 2:30 that afternoon.  Ten minutes after Correll made this appointment, she decided to contact emergency medical personnel so that her mother could be transported immediately to the emergency room of a hospital.

Sherry W. Weeks, a certified emergency medical technician and a member of the rescue squad in Bedford County, responded to the Paxton residence.  Paxton was seated at a kitchen table.  Weeks assessed her condition as follows:

"Immediately upon our arrival, [Paxton] was severely dehydrated. . . . She was unresponsive, other than to painful stimuli, which means that we would basically have to pinch [her] before we could get any response out of her at all. She was severely dehydrated. Her eyes were very sunken in. Her cheek bones were sunken. Just severely dehydrated. Her pulse was low. Her blood pressure was low. She was pretty close to going into shock."

Correll informed Weeks that "her mother had not eaten for the last day and had gotten dehydrated." Weeks testified, without objection, that her physical assessment of Paxton was not consistent with the history that Correll had provided. Weeks stated that "the condition that Ms. Paxton was in was not consistent with only being dehydrated for a day." Dixie Daniel, Paxton's primary nurse in the emergency room of Carilion Roanoke Memorial Hospital, testified that Paxton's "appearance, her thinness, the dryness of her skin is something that you would usually see taking longer than two days to occur." Daniel observed a decubitus on Paxton's right hip, and she stated: "It ranked up there with some of the worst ones that I've seen."

Dr. Salama treated Paxton at the emergency room of the hospital. He testified that she had "advanced Parkinsonism, dementia, dehydration, [and] cachexia." He defined cachexia as undernutrition. Dr. Salama described Paxton's undernutrition as "[v]ery severe." He stated that it was

6

unlikely that this degree of undernutrition would have developed during the course of a weekend.

Paxton suffered moderate to severe dehydration, and she had stage 3 and early stage 4 decubiti.  Dr. Salama testified that stage 3 decubiti developed "over days, weeks – to weeks, but not hours or not 24.  I don't think that I have ever seen Stage 4 or Stage 3 decubiti developing over 48 hours."  Paxton also suffered from bacteremia, a condition in which bacteria is present in the blood.  The source of the bacteria may have been the presence of decubiti on Paxton's body.  The presence of the bacteremia indicated to Dr. Salama that the decubiti had not been treated properly.

Dr. Salama stated that Paxton's albumin level upon admission to the hospital was 2.6.  This level was a significant and drastic change from Paxton's albumin level that existed when Dr. Salama treated her in January 2000. Paxton's low albumin level indicated that "she [was] undernourished."  Dr. Salama testified that Paxton's decubiti, severe dehydration, and undernourishment posed a significant threat to her life or health.  He also stated that had Paxton merely refused to eat or drink water for only two days, this limited deprivation would not have affected her albumin level. He said that "albumin [has] a long life.  To make a change, it needs twenty-one days."

7

Various nurses who rendered care to Paxton when she was a patient in the hospital testified at trial.  Tracy A. Mann stated that Paxton's "condition upon admission . . . was shocking. . . .  She was morbidly emaciated and covered with decubitus or bedsores."  Mann testified, without objection, that two of the decubiti present on Paxton's body would have taken a month or more to develop because they were black in appearance and "had hardened."  Mann also testified without objection that Paxton's "oral mucous membranes were dry and her tongue was cracked, which is consistent with dehydration." Mann stated that "[b]ased on her physical appearance, [Paxton] was severely malnourished."

Correll informed Martha Anderson, a geriatric clinical nurse who performed an assessment of Paxton, that Correll was aware that her mother had decubiti, but that she did not know how to use the Duoderm patch correctly.  Anderson stated, without objection, "I've seen a fair amount of bedsores in my many years of nursing.  And most Stage 3 ulcers have taken months to develop, but certainly weeks.  Weeks to months." Anderson also testified without objection that Paxton's poor physical health could have been prevented with proper treatment.

Doris P. Jones, a registered nurse and a certified wound care nurse, testified that if a patient does not receive

8

adequate nutrition, wounds will not heal.  Jones stated without objection that a patient with Paxton's medical condition would not always develop decubiti and that Paxton's decubiti were preventable.

Dr. Salama stated that Paxton's decubiti began healing while she was in the hospital.  Tracey Mann testified that Paxton's decubiti started to heal within four days, as indicated by "pinking around the margins" of the decubiti.  Martha Anderson testified that Paxton's nutritional status improved from September 22nd to October 30th, as indicated by an increase in Paxton's fatty tissue and the healing of the skin around Paxton's decubiti.

Paxton was discharged from the hospital to a nursing home on October 3, 2000, and her condition improved.  Mark L. Pittman, a nurse who rendered care to Paxton at the nursing home, testified that Paxton was not able to feed herself and that she was dependent upon others to assist her.  Pittman explained that Paxton ate food while in the nursing home, and she interacted with the staff and assisted in her daily living activities.

Paxton was transported to the hospital again on October 25, 2000 because a nursing assistant heard a "rattle" in her chest.  She was admitted to the hospital where she died of pneumonia three days later.

Dr. William Massello, a forensic pathologist who is the assistant chief medical examiner for western Virginia, performed an autopsy upon Paxton's body. He testified that her body "was extremely emaciated. She had virtually no fat beneath her skin. Her bones were visible externally. She had virtually no muscle that – no muscle mass that could be observed." Dr. Massello stated that his findings during the autopsy indicated that Paxton had experienced "a state of chronic starvation." Paxton's lack of nutrition and food had caused her body to "cannibalize its own tissue as a food source. And the fat has been utilized and then some of the important proteins of the body which give the body structure such as the muscle have been utilized by the body for food."

Dr. Massello testified that his findings during the autopsy were consistent with Paxton's condition on admission to the hospital on September 18, 2000. Dr. Massello stated that in his opinion, when Paxton was admitted to the hospital on that date, she was experiencing "a severe case of malnourishment." He testified within a reasonable degree of medical probability that Paxton had been malnourished for at least a few months before her admission to the hospital in September 2000. He further explained he found no indication that Paxton was physically unable to eat. Dr. Massello stated that Paxton's cause of death was pneumonia due to corporeal

10

emaciation and inanition due to chronic starvation.

Continuing, Dr. Massello stated:  "Emaciation is loss of mass.

Being very skinny and without, as I say, any fat or muscle.

And inanition is the state of weakness and debilitation caused

by the lack of proper nutrition."  Finally, Dr. Massello

testified Paxton's undernourishment was not normal for a

patient of 83 years, even a patient with Parkinson's disease,

dementia, or Alzheimer's.

III.

Code § 18.2-369 states in relevant part:[2]

> "A.  It shall be unlawful for any responsible
> person to abuse or neglect any incapacitated adult
> as defined in this section.  Any responsible person
> who abuses or neglects an incapacitated adult in
> violation of this section and the abuse or neglect
> does not result in serious bodily injury or disease
> to the incapacitated adult shall be guilty of a
> Class 1 misdemeanor.  Any responsible person who is
> convicted of a second or subsequent offense under
> this subsection shall be guilty of a Class 6 felony.
>
> "B.  Any responsible person who abuses or
> neglects an incapacitated adult in violation of this
> section and the abuse or neglect results in serious

---

[2] Code § 18.2-369 was amended in 2001 and 2004.  The standard of felony liability for abuse or neglect that "results in serious bodily injury or disease to the incapacitated adult" set out in paragraph (A) of the statute as it existed during the events in the year 2000 that form the basis of the present prosecution, is unchanged and is now set out in a separately numbered paragraph (B) of this Code provision, and the definitions formerly in paragraphs (A) and (B) have been renumbered in subparagraph (C) without substantive change.  We will use the current numbering in this opinion.

bodily injury or disease to the incapacitated adult shall be guilty of a Class 4 felony.

"C. For purposes of this section:

. . . .

" 'Neglect' means the knowing and willful failure by a responsible person to provide treatment, care, goods or services which results in injury to the health or endangers the safety of an incapacitated adult."

The circuit court concluded that the defendant knowingly and willfully neglected her mother and that such neglect resulted in serious bodily injury to her mother. Correll argued in the circuit court and Court of Appeals, and she also argues in this Court, that the evidence was not sufficient to find her guilty of felony neglect of an incapacitated adult resulting in serious bodily injury because there is no evidence that she knowingly or willfully caused any injuries or failed to provide treatment or care to her mother. We disagree.

When a defendant contests the sufficiency of the evidence on appeal, this Court must give the judgment of the circuit court sitting without a jury the same weight as a jury verdict. Commonwealth v. Duncan, 267 Va. 377, 384, 593 S.E.2d 210, 214 (2004); McCain v. Commonwealth, 261 Va. 483, 492, 545 S.E.2d 541, 547 (2001); Tarpley v. Commonwealth, 261 Va. 251, 256, 542 S.E.2d 761, 763 (2001); Hickson v. Commonwealth, 258

Va. 383, 387, 520 S.E.2d 643, 645 (1999). Additionally, this Court has the duty to review the evidence that tends to support the conviction and affirm the circuit court's judgment unless it appears from the evidence that the judgment is plainly wrong or without evidence to support it. Code § 8.01-680; Duncan, 267 Va. at 384, 593 S.E.2d at 214; Jackson v. Commonwealth, 267 Va. 178, 204, 590 S.E.2d 520, 535 (2004); McCain, 261 Va. at 492-93, 545 S.E.2d at 547; Tarpley, 261 Va. at 256, 542 S.E.2d at 763; Phan, 258 Va. at 511, 521 S.E.2d at 284.

The record before this Court clearly establishes that the evidence was sufficient beyond a reasonable doubt to support the conviction. Pursuant to Code § 18.2-369: " 'Neglect' means the knowing and willful failure by a responsible person to provide treatment, care, goods or services which results in injury to the health or endangers the safety of an incapacitated adult." Even though this Court has not previously discussed the meaning of the word "willful" as used in this statute, this Court has interpreted the meaning of the word "willful" as used in Code § 18.2-371.1(B)(1), which is a child abuse and neglect criminal statute. We stated:

> "The statutory requirement that such conduct be
> 'willful' means that the conduct must be knowing or
> intentional, rather than accidental, and be done
> without justifiable excuse, without ground for
> believing the conduct is lawful, or with a bad

13

purpose.  See Bryan v. United States, 524 U.S. 184, 191-92 (1998); United States v. Murdock, 290 U.S. 389, 394-95 (1933); Ellis [v. Commonwealth, 29 Va. App. 548, 554, 513 S.E.2d 453, 456 (1999)].  Thus, the term 'willful,' as used in Code § 18.2-371.1(B)(1), contemplates an intentional, purposeful act or omission in the care of a child by one responsible for such child's care."

Duncan, 267 Va. at 384-85, 593 S.E.2d at 214-15.  Accord Barrett v. Commonwealth, 268 Va. 170, 183, 597 S.E.2d 104, 110-11 (2004).  This definition is equally applicable to Code § 18.2-369(B) and (C).

We hold that in the context of Code § 18.2-369, the word "willful" describes conduct that must be knowing or intentional, rather than accidental, and undertaken without justifiable excuse, without ground for believing the conduct is lawful or with a bad purpose.  Thus, "willful," as used in Code § 18.2-369, contemplates an intentional, purposeful act or omission in the care of an incapacitated adult by one responsible for that adult's care.

The evidence in the record before this Court establishes, beyond a reasonable doubt, that Correll knowingly and willfully failed to provide medical treatment to her incapacitated mother.  Dr. Salama had discussed Paxton's medical condition with Correll in January 2000 and told her to return to his office with her mother in six months or sooner if Paxton's condition deteriorated.  Paxton's condition

14

deteriorated.  Without question, Paxton was incapacitated and totally dependent upon her daughter, Correll.

Paxton's severe dehydration and chronic starvation may have been caused by several factors:  Paxton may have refused to eat, she may have been unable to eat, or no one provided nutrition to her.  As a result of one or more of the aforementioned factors, Paxton experienced severe starvation.  Dr. Salama described the decedent's undernutrition as "[v]ery severe," and he concluded that it was unlikely that this condition developed during the course of two days.  In spite of Paxton's malnutrition, irrespective of its cause, Correll failed to seek treatment for Paxton even though Dr. Salama had instructed Correll to bring Paxton to his office for treatment if she experienced any problems.

The necrotic decubiti that were present on Paxton's body had been there for at least a month before Correll sought medical assistance, and the decubiti would not heal because Paxton had not received adequate nutrition.  Correll admitted to a nurse that Correll was unable to properly apply treatment to the decubiti.  Yet, Correll did not seek medical treatment for Paxton, although she was her court-appointed legal guardian and under a duty to do so.  As we have already stated in Part II of this opinion, Dr. Massello stated within a reasonable degree of medical probability that Paxton had been

15

malnourished for at least a few months prior to her admission to the hospital in September 2000 and that her chronic starvation, dehydration, and infected decubiti constituted a serious threat to her health and safety. These facts, as well as the other facts described in Part II of this opinion, are more than sufficient to permit the fact finder to conclude beyond a reasonable doubt that the defendant's conduct was knowing and willful within the intendment of Code § 18.2-369.

The defendant's contention that her conduct did not result in "Paxton suffering 'serious bodily injury or disease' " is without merit. Code § 18.2-369 defines "serious bodily injury or disease" as, among other things, "life-threatening internal injuries or conditions, whether or not caused by trauma." As we have already stated, Dr. Salama testified that Paxton's severe dehydration, undernourishment, and infected decubiti were conditions that imposed a significant threat to her life or health. Dr. Massello testified that Paxton suffered from chronic starvation and that this condition, along with her dehydration and infected decubiti, was a serious threat to her health and safety. Dr. Massello also opined that Paxton died of pneumonia and that the pneumonia was a foreseeable and expected consequence of chronic starvation.

IV.

16

For the foregoing reasons, we will affirm the judgment of the Court of Appeals.

<u>Affirmed</u>.