# COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present:   Judges O'Brien, Fulton and Callins
Argued at Richmond, Virginia


TORI NICHOLE JACKSON-HOPE, SOMETIMES KNOWN AS
  TORI JACKSON HOPE
                                        MEMORANDUM OPINION[*] BY
v.      Record No. 0878-22-2          JUDGE MARY GRACE O'BRIEN
                                             MARCH 12, 2024

COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF THE CITY OF RICHMOND
Catherine C. Hammond, Judge Designate

Paul C. Galanides for appellant.

Mason D. Williams, Assistant Attorney General (Jason S. Miyares,
Attorney General, on brief), for appellee.


A jury convicted Tori Nichole Jackson-Hope (appellant) of neglecting a vulnerable adult in

violation of Code § 18.2-369(B).  Appellant argues that the evidence was insufficient to prove that

she willfully neglected the victim.  Finding no error, we affirm.

---

[*] This opinion is not designated for publication.  *See* Code § 17.1-413(A).

BACKGROUND[1]

In January 2020, appellant and her husband began caring for their nephew, T.H., after his mother died.[2] T.H. is a vulnerable adult with cerebral palsy, autism, and an intellectual disability. T.H. is unable to orally communicate.

Jessica Lawson, T.H.'s case manager at Richmond Behavior Health Authority at the time, described T.H. as "active," "happy," and "energetic." Lawson's last visit with T.H. before he began living with appellant "went great," and T.H. was doing well.

Lawson coordinated T.H.'s care with appellant and her husband when he moved in with them in January. Lawson was unable to visit T.H. in person after March 2020 due to the COVID-19 pandemic, but she conducted monthly virtual check-ins. During these check-ins, appellant told Lawson that T.H. was "getting along really well." Appellant never raised any concerns regarding T.H.'s weight loss or injuries, and she did not report experiencing difficulties feeding T.H.

Dr. Kausalya Pendyal, T.H.'s primary care provider for several years, typically saw him every six months. On June 4, 2020, appellant's husband took T.H. to Dr. Pendyal's office for a visit. T.H. weighed only 109 pounds—28 pounds less than he weighed in December 2019. Dr. Pendyal described this weight loss as "significant" because it placed T.H. at risk for kidney or heart failure. The office scheduled a follow-up appointment for 11 days later, but appellant did not bring T.H. back for the appointment.

---

[1] On appeal, we state the facts "in the 'light most favorable' to the Commonwealth, the prevailing party in the trial court." *Hammer v. Commonwealth*, 74 Va. App. 225, 231 (2022) (quoting *Commonwealth v. Cady*, 300 Va. 325, 329 (2021)). "In doing so, we discard any of appellant's conflicting evidence and regard as true all credible evidence favorable to the Commonwealth and all inferences that may reasonably be drawn from that evidence." *McGowan v. Commonwealth*, 72 Va. App. 513, 516 (2020).

[2] We use the victim's initials to protect his privacy.

Pediatric dentist Dr. Brandon Allen saw T.H. on July 16, 2020. Dr. Allen, who had also treated T.H. for several years, was "stunned" by T.H.'s appearance. T.H. "had lost weight" and "was far less active than normal." T.H. also had multiple ulcerations in his mouth and a fractured tooth.

The next day, July 17, 2020, T.H. arrived at the emergency room at approximately 8:00 p.m. Attending trauma surgeon Dr. Stanley Kurek testified that T.H. had "no blood pressure," was "in cardiac arrest," and "looked dead." T.H. had sustained burns to his face, neck, right shoulder, right elbow, left hand, left hip, and left buttock. These burns affected 10 to 12 percent of his body.

T.H. also suffered extensive fractures to his head and face, including a "left parietal depressed skull fracture with pneumocephalus"; a "left frontal skull fracture"; a "temporal skull fracture"; a "[b]ilateral nose fracture[]"; a "left lateral orbital fracture"; two sinus fractures; a fracture to the zygomatic arch at the base of the eyes; and several broken teeth. Additionally, T.H. sustained a fractured scapula; a fractured seventh rib; a fracture to his ninth thoracic vertebrae; two lumbar fractures; a "pubic fracture"; and fractures on both sides of his pelvis. Dr. Kurek opined that the fractures were "a day or two" old. Dr. Kurek described several of T.H.'s fractures as "high-force" injuries and concluded that T.H.'s scapula, vertebrae, and sinus fractures would have required a "direct blow."

T.H. weighed only 101 pounds on July 17. Dr. Kurek testified that a normal body mass index (BMI)[3] was above 19, but T.H.'s BMI was only 13. Dr. Kurek stated that a BMI of 13 reflected "a severe protein and caloric malnutrition" sustained "over a period of time" and showed that T.H. was "extremely malnourished." T.H.'s albumin level was 2, and the normal range is "3.4 to 5." Dr. Kurek opined that it would take more than "a week or two" of "insufficient . . . caloric intake" for T.H.'s albumin level to drop so low. T.H.'s blood was "extremely acidotic from either

---

[3] BMI is the ratio of a person's weight to his height.

blood loss or from being down and not having fluids going into him." His blood's "base excess" level was "minus 16." Dr. Kurek explained that 50 percent of patients with a base excess of minus 10 or greater die. He stated that it probably took "a few hours" without fluids and "bleeding internally from all of these fractures" for T.H.'s blood to reach that level.[4]

Richmond Police forensic investigator Tyler Spillane went to appellant's residence in the early morning hours of July 18, 2020. He photographed multiple holes in the wall of T.H.'s bedroom and noted dried blood stains in the holes and blood spatter on the wall. The carpet, pillows, and blankets on the floor of T.H.'s room were covered in wet blood stains. Additionally, Investigator Spillane photographed a hole in the wall in the hallway between T.H.'s bedroom and the bathroom, a blood stain in that hole, blood spatter on the wall, and a blood stain on the bathroom door frame.

Appellant testified that she never intentionally hurt T.H. or failed to care for him. Appellant stated that, while T.H. "wasn't eating like he normally would," she "didn't see any weight loss." She claimed T.H. was "still consuming some things" and that she was supplementing his diet with Ensure. In the days before July 17, appellant noticed that T.H. was "moving a little bit more slowly," but she did not see "any other signs that maybe his health might have been declining." Appellant's daughter also testified that T.H. was provided food and that "sometimes he would eat; sometimes he wouldn't."

Appellant disclaimed knowledge of how T.H. obtained the fractures throughout his body. She speculated that they may have resulted from T.H. falling off a trampoline in June 2020 or

---

[4] Although three pages of Dr. Kurek's direct testimony are missing from the trial transcript, we conclude that this defect in the record is insignificant and thus does not preclude this Court from addressing the merits of the appeal. *See Jay v. Commonwealth*, 275 Va. 510, 520 (2008).

tripping over a vacuum cord and falling into a wall in early July 2020. She further stated that the blood on T.H.'s bedding came from nose bleeds.

According to appellant, she checked on T.H. around 6:00 p.m. on July 17 and found that he had soiled himself. Appellant cleaned T.H., then left him in the tub with the water on while she went to retrieve a towel. She acknowledged being the only adult home at the time. Appellant stated that T.H. could not stand up when she returned, so she and her daughter carried him to his bedroom. She claimed that her husband returned from work "not even five minutes" after she carried T.H. out of the shower, and they decided to take him to the emergency room. Despite the photographs of the injuries and burns admitted into evidence, she testified that she "didn't see anything was wrong with him" at the time.

The jury found appellant guilty of neglecting T.H. in violation of Code § 18.2-369(B).[5] This appeal followed.

ANALYSIS

"When reviewing the sufficiency of the evidence, '[t]he judgment of the trial court is presumed correct and will not be disturbed unless it is plainly wrong or without evidence to support it.'" *McGowan v. Commonwealth*, 72 Va. App. 513, 521 (2020) (alteration in original) (quoting *Smith v. Commonwealth*, 296 Va. 450, 460 (2018)). "The relevant issue on appeal is, 'upon review of the evidence in the light most favorable to the prosecution, whether *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Lambert v. Commonwealth*, 298 Va. 510, 515 (2020) (quoting *Pijor v. Commonwealth*, 294 Va. 502, 512 (2017)). "This deferential standard of review 'applies not only to the historical facts themselves, but the inferences from those facts as well.'" *Johnson v. Commonwealth*, 53 Va. App. 79, 100 (2008) (quoting *Crowder v. Commonwealth*, 41 Va. App. 658, 663 n.2 (2003)).

_____

[5] The jury acquitted appellant of abusing T.H. in violation of the same statute.

"The inferences to be drawn from proven facts, so long as they are reasonable, are within the province of the trier of fact." *Id.* (quoting *Hancock v. Commonwealth*, 12 Va. App. 774, 782 (1991)).

"Any responsible person who . . . neglects a vulnerable adult" and the "neglect results in serious bodily injury or disease to the vulnerable adult is guilty of a Class 4 felony." Code § 18.2-369(B). "Neglect" is defined as "the knowing and willful failure by a responsible person to provide treatment, care, goods, or services which results in injury to the health or endangers the safety of a vulnerable adult." Code § 18.2-369(C).

"[T]he word 'willful' describes conduct that must be knowing or intentional, rather than accidental, and undertaken without justifiable excuse, without ground for believing the conduct is lawful or with a bad purpose." *Correll v. Commonwealth*, 269 Va. 3, 13 (2005). "Thus, 'willful,' as used in Code § 18.2-369, contemplates an intentional, purposeful act or omission in the care of a[] [vulnerable] adult by one responsible for that adult's care." *Id.*

"In the absence of direct evidence of intent, willfulness must be established through circumstances." *Lambert v. Commonwealth*, 6 Va. App. 360, 363 (1988). "Circumstantial evidence is as acceptable to prove guilt as direct evidence, and in some cases, such as proof of intent or knowledge, it is practically the *only* method of proof." *Abdo v. Commonwealth*, 64 Va. App. 468, 475-76 (2015) (quoting *Parks v. Commonwealth*, 221 Va. 492, 498 (1980)). "[I]n a circumstantial evidence case, . . . the accumulation of various facts and inferences, each mounting upon the others, may indeed provide sufficient evidence beyond a reasonable doubt . . . ." *Ervin v. Commonwealth*, 57 Va. App. 495, 505 (2011) (en banc).

Appellant argues that the evidence was insufficient to prove that she willfully neglected T.H.; instead, she contends it merely showed that she "lacked perceptiveness."[6]

The evidence of T.H.'s condition was undisputed. T.H. was near death when he arrived at the emergency room on July 17. He was in cardiac arrest, had no pulse, and was severely malnourished and underweight. He also had severe burns across his body and had suffered numerous painful and debilitating fractures throughout his body. A rational fact finder could reasonably infer from T.H.'s extreme condition and the supporting evidence that appellant did not merely "lack perceptiveness," but rather knowingly and willfully failed to provide T.H. with the treatment and care he required without justifiable excuse.

The evidence showed that T.H.'s drastic weight loss occurred over the course of several months. In June, T.H.'s primary care provider noted that his weight was dangerously low, but appellant failed to return with T.H. for a follow-up appointment. T.H.'s emaciated state was readily apparent. Indeed, T.H.'s dentist testified that he was "stunned" by T.H.'s weight loss. T.H.'s BMI and blood analysis reflected a "severe protein and caloric malnutrition" sustained "over a period of time" and showed that he was "extremely malnourished."

The evidence also established that T.H.'s burns and numerous fractures were not treated in a timely fashion. The trauma surgeon, Dr. Kurek, explained that it likely would have taken "a few hours" for T.H.'s blood's base excess level to reach a minus 16 while he was "bleeding internally from all of these fractures." Dr. Kurek further opined that T.H.'s fractures were "a day or

---

[6] As a threshold matter, appellant argues that because the jury acquitted her of abusing T.H., the Commonwealth was left with a "theory of prosecution which rest[ed] only upon [T.H.'s] weight loss," and therefore, we may only consider T.H.'s malnourishment and weight loss as evidence of her neglect. On appeal, however, "the sufficiency of the evidence is to be determined from the entire record." *Hargraves v. Commonwealth*, 219 Va. 604, 605 (1978). Moreover, our sufficiency "examination is not limited to the evidence mentioned by a party in trial argument or by the trial court in its ruling. In determining whether there is evidence to sustain a conviction, an appellate court must consider all the evidence admitted at trial that is contained in the record." *Bolden v. Commonwealth*, 275 Va. 144, 147 (2008).

two" old. A rational fact finder could also conclude from T.H.'s dire condition when he arrived at the hospital and the blood throughout his room that he was not timely treated for his burns.

Appellant argues that neither T.H.'s primary care physician or his dentist were "alarmed enough" by T.H.'s weight to send him to the hospital, and notes that the fact that appellant sought primary and dental care for T.H. supports her contention that she did not willfully neglect T.H. She also asserts that her daughter's testimony corroborated her claim that T.H. "was never denied food" and that it was simply "difficult to persuade [T.H.] to consume enough to maintain his health."

Appellant invites us to reweigh the evidence. An appellate court, however, "does not 'retry the facts,' reweigh the evidence, or make its own determination of the 'credibility of [the] witnesses.'" *Yahner v. Fire-X Corp.*, 70 Va. App. 265, 273 (2019) (alteration in original) (quoting *Jeffreys v. Uninsured Emp.'s Fund*, 297 Va. 82, 87 (2019)). It "is within the exclusive province of the [fact finder]" to determine the credibility of the witnesses, and "[i]n its role of judging witness credibility, the fact finder is entitled to disbelieve the self-serving testimony of the accused and to conclude that the accused is lying to conceal [her] guilt." *Maust v. Commonwealth*, 77 Va. App. 687, 702-03 (2023) (en banc) (first and second alterations in original) (first quoting *Dalton v. Commonwealth*, 64 Va. App. 512, 525 (2015); and then quoting *Speller v. Commonwealth*, 69 Va. App. 378, 388 (2018)). "When 'credibility issues have been resolved by the [fact finder] in favor of the Commonwealth, those findings will not be disturbed on appeal unless plainly wrong.'" *Id.* at 703 (alteration in original) (quoting *Towler v. Commonwealth*, 59 Va. App. 284, 291 (2011)). Here, the evidence was sufficient for a rational fact finder to reject appellant's testimony and find that she willfully neglected T.H.

CONCLUSION

Accordingly, we affirm the court's judgment.

*Affirmed.*