COURT OF APPEALS OF VIRGINIA

Present: Judges AtLee, Friedman and Frucci
Argued at Norfolk, Virginia

**PUBLISHED**

JASON JOSEPH FERGESON

v.      Record No. 0182-24-1

COMMONWEALTH OF VIRGINIA

OPINION BY
JUDGE RICHARD Y. ATLEE, JR.
MARCH 11, 2025

FROM THE CIRCUIT COURT OF THE CITY OF WILLIAMSBURG AND
COUNTY OF JAMES CITY
Holly B. Smith, Judge

Ivan D. Fehrenbach (Dansby & Fehrenbach, on brief), for appellant.

Victoria Johnson, Senior Assistant Attorney General (Jason S.
Miyares, Attorney General, on brief), for appellee.

Jason Fergeson appeals his convictions for misdemeanor abuse or neglect of a vulnerable

adult, in violation of Code § 18.2-369, and misdemeanor attempting to interfere with a 9-1-1 call,

in violation of Code § 18.2-164. On appeal, he argues that the evidence was insufficient to

sustain a conviction under Code § 18.2-369 because Lindsey Thompson was not a "vulnerable

adult," he was not a "responsible person," and his actions did not constitute "abuse or neglect."

He also argues that the evidence was insufficient to prove he attempted to interfere with a 9-1-1

call because he did not have the required intent. Because we find the evidence sufficient to

sustain his convictions, we affirm.

I. BACKGROUND

"On appeal, we state the facts in the light most favorable to the Commonwealth," the

prevailing party below. *Newsome v. Commonwealth*, 81 Va. App. 43, 48 (2024).

On November 9, 2022, A.J. Burrell was driving in the King William Travelodge parking lot when he observed Fergeson and a woman, later identified as Thompson, in a nearby wooded area at the "end of" a hill. Fergeson had Thompson "pinned up against [a] tree" and was crouched over her, smacking her in the face "trying to get her attention." Upon seeing Burrell, Fergeson approached Burrell's vehicle and asked for a ride down the street. Fergeson told Burrell he was going to leave Thompson there because she did this "all the time."

Iris, Burrell's friend and neighbor, approached and noticed that Thompson was "pretty pale" and had "blue lips." Burrell found the entire situation "odd," and he informed Fergeson that he was going to call 9-1-1. Fergeson objected, and he told them not to call 9-1-1 because "she does this normally." Burrell called 9-1-1 anyway.

Fergeson told Iris and Burrell to "move away" four or five times. Burrell testified that he was concerned for his physical safety based on Fergeson's words and behavior; he did not know what Fergeson "was capable of." The recording of the 9-1-1 call was admitted at trial. Burrell told the 9-1-1 operator that there was a woman who looked "blue" and "dead." He described the woman as "non-responsive," and he did not think that she was breathing. When the 9-1-1 operator asked if anyone at the scene felt comfortable performing CPR, Iris explained that Fergeson was preventing them from helping and that he was not performing CPR himself. Burrell described Fergeson as holding Thompson's body up against a tree and "giving her kisses," while Iris explained that Fergeson was "trying to wake her up" by "shaking her." The 9-1-1 operator, who was on speaker phone, tried to address Fergeson, but he did not respond. Iris and Burrell relayed the operator's instructions to Fergeson. Eventually, Fergeson placed Thompson flat on the ground, but he did not perform CPR. Fergeson repeatedly indicated that Thompson was breathing and just needed more air, but Burrell believed she was dead. When the

operator asked if Fergeson was performing CPR, or if he would allow Iris or Burrell to, Burrell responded in the negative.

Andrew Lane, a master firefighter paramedic for the City of Williamsburg Fire Department, was one of the first to arrive on scene. He testified that they found Thompson laying in a ditch. Fergeson was standing next to Thompson, and he identified himself as her boyfriend. Lane described Thompson as unresponsive, her lips were blue, and her breathing was "very low and shallow." They placed a breathing apparatus on Thompson and, using a heart monitoring machine, measured the amount of carbon dioxide in her bloodstream, which indicated her breathing had been compromised for "a long time." Other paramedics arrived and administered two Narcan injections before transporting Thompson to the hospital, where she was given Narcan intravenously due to the severity of her drug overdose.[1]

Officers on scene recognized both Fergeson and Thompson from previous service calls involving them both. The officers testified that Fergeson and Thompson were in a romantic relationship, and they had previously referred to themselves as husband and wife.

Following the Commonwealth's presentation of evidence, Fergeson moved to strike the evidence. He argued that the evidence was insufficient to prove the abuse and neglect of a vulnerable adult because he was not a responsible person as defined by the statute, he had not abused or neglected Thompson, and she was not a vulnerable person as contemplated by the statute. He also argued that there was no evidence he had interfered with anyone making a 9-1-1

---

[1] A toxicology report revealed that Thompson had multiple substances, as well as their metabolic byproducts, in her blood system, including fentanyl, despropionylfetanyl, para/meta-fluorofentanyl, morphine, benzoylecgonine (a metabolite of cocaine or opioids), and 7-aminoclonazepan (a metabolite of clonazepam). A forensic toxicologist testified that the presence of these substances together indicated that the fentanyl was illicitly manufactured. She also testified that the level of fentanyl in Thompson's blood was ten times as high as what one would expect to see in a patient sedated for surgery.

call because he had not damaged the telephone or threatened anyone. The trial court denied the motion.

Fergeson then testified on his own behalf. He explained that Thompson paid her own bills and attended her own doctors' appointments. He denied that he assumed responsibility for her. He acknowledged on cross-examination that he had two prior felony convictions.

He then renewed his motion to strike, which the trial court again denied. The trial court found that Fergeson did neglect Thompson and his actions further endangered her. Thompson was a vulnerable adult because she was unresponsive, her lips were blue, she was having difficulty breathing, and multiple witnesses believed that she was dead. The trial court found that the temporary nature of the drug overdose did not prevent a finding that Thompson was a vulnerable adult under the statute. Though the trial court did consider the relationship between Thompson and Fergeson, it was particularly persuaded that Fergeson was a responsible person because he assumed control of and responsibility for the situation by refusing to let people help Thompson. The trial court also found that although Fergeson did not succeed in preventing Burrell from calling 9-1-1, he did attempt to do so. The trial court found Fergeson guilty of misdemeanor abuse and neglect of a vulnerable adult[2] and misdemeanor attempting to interfere with a 9-1-1 call. Fergeson now appeals.

## II. ANALYSIS

### A. *Standard of Review*

Fergeson argues that the trial court erred when it denied his motion to strike the evidence. "A motion to strike challenges whether the evidence is sufficient to submit the case to the [factfinder]." *Lawlor v. Commonwealth*, 285 Va. 187, 223 (2013). When faced with a challenge

---

[2] Fergeson was initially indicted for felony abuse or neglect of a vulnerable adult. The felony charge, however, requires that the abuse and neglect result in serious bodily injury, and the trial court found that element had not been met.

to the sufficiency of the evidence, "we review the evidence in the 'light most favorable' to the Commonwealth, the prevailing party in the trial court." *Commonwealth v. Barney*, 302 Va. 84, 96 (2023) (quoting *Commonwealth v. Hudson*, 265 Va. 505, 514 (2003)).  Whether the evidence is sufficient to prove the elements of a crime "is a factual finding, which will not be set aside on appeal unless it is plainly wrong." *Lawlor*, 285 Va. at 223-24.  To the extent our review requires statutory interpretation, that is an issue of law that "we review de novo." *VACORP v. Young*, 298 Va. 490, 494 (2020) (quoting *Conyers v. Martial Arts World of Richmond, Inc.*, 273 Va. 96, 104 (2007)).

B. *The trial court correctly interpreted Code § 18.2-369, and the evidence was sufficient to sustain Fergeson's conviction for abuse or neglect of a vulnerable adult.*

Fergeson argues that the trial court erred in its interpretation of Code § 18.2-369.  He contends, as he did below, that the vulnerable adult statute was not intended to cover the facts of this case.  We disagree.

Code § 18.2-369(A) provides, in relevant part,

> It is unlawful for any responsible person to abuse or neglect any vulnerable adult.  Any responsible person who abuses or neglects a vulnerable adult in violation of this section and the abuse or neglect does not result in serious bodily injury or disease to the vulnerable adult is guilty of a Class 1 misdemeanor.

Fergeson argues that Thompson was not a "vulnerable adult," he was not a "responsible person," and he neither abused nor neglected her as those terms are defined within the statute.  We address each element in turn.

1. Thompson was a vulnerable adult within the meaning of the statute.

Fergeson argues that Thompson was not a vulnerable person as that term is contemplated by Code § 18.2-369 because the statute does not contemplate intoxication or other temporary forms of impairment.  He contends that the statute applies in situations where the adult has "permanent or long-standing problems."

"[S]tatutory interpretation must begin with the text itself to determine the intent of the legislature." *Davenport v. Util. Trailer Mfg. Co.*, 74 Va. App. 181, 196 (2022). In interpreting a statute, we look to the plain meaning of the words. *Seabolt v. Cnty. of Albemarle*, 283 Va. 717, 729 (2012). "[W]hen the General Assembly has used words that have a plain meaning, courts cannot give those words a construction that amounts to holding that the General Assembly meant something other than that which it actually expressed." *Street v. Commonwealth*, 75 Va. App. 298, 306 (2022) (quoting *Coles v. Commonwealth*, 44 Va. App. 549, 557 (2004)). This stems from the principle that we assume "the legislature chose, with care, the words it used when it enacted the relevant statute." *Coles*, 44 Va. App. at 558 (quoting *Barr v. Town & Country Props., Inc.*, 240 Va. 292, 295 (1990)).

Code § 18.2-369(C) defines "vulnerable adult" as

> any person 18 years of age or older who is impaired by reason of mental illness, intellectual or developmental disability, physical illness or disability, or other causes, including age, to the extent the adult lacks sufficient understanding or capacity to make, communicate, or carry out reasonable decisions concerning his well-being or has one or more limitations that substantially impair the adult's ability to independently provide for his daily needs or safeguard his person, property, or legal interests.

"Impaired" can mean "[d]iminished, damaged, or weakened," "[f]unctioning poorly or incompetently," or "[h]aving a physical or mental disability." *Impaired*, *Am. Heritage Dictionary of the English Language* (5th ed. Harper Collins 2022). While some of the listed conditions do suggest a more long-term condition, others appear broad enough to include conditions of a more limited duration, such as "physical illness or disability." Code § 18.2-369(C).

"Illness" can be defined as "the quality, state or condition of being sick; bodily or mental indisposition." *Illness*, *Black's Law Dictionary* (12th ed. 2024). While "disability" means "a physical or mental condition that significantly limits a person's motor, sensory, or cognitive

- 6 -

abilities." *Disability*, *Am. Heritage Dictionary*, *supra*. Not every illness is chronic or long term, and yet could cause impairment within the meaning of a statute. For example, a stroke can cause significant impairment. Yet, depending on the circumstances, the effects of a stroke can be temporary or long-term; some people recover very quickly, while others recover more slowly or have long-term issues. Thus, the focus of the statute appears to be on the impairment of the adult regardless of the duration of that impairment.

Beyond the listed conditions, the statute also broadly includes "other causes." Code § 18.2-369(C). Rather than any kind of temporal limitation, the "other causes" language focuses on the impact of the condition on the adult. Specifically, Code § 18.2-369(C) looks to whether the "other cause" affects the adult's "understanding or capacity to make, communicate, or carry out reasonable decisions concerning his well-being" or whether he "has one or more limitations that substantially impair the adult's ability to independently provide for his daily needs or safeguard his person, property, or legal interests."

Regardless of whether Thompson's condition is considered a physical illness or an "other cause," it certainly impaired her ability to care for herself. Thompson was unconscious, nonresponsive, and barely breathing.[3] She did not have the capacity to understand, let alone make, decisions concerning her well-being. Nor was she able to "safeguard [her] person, property or legal interests." Code § 18.2-369(C). She was entirely incapacitated and vulnerable.

---

[3] Fergeson repeatedly refers to this situation as intoxication. Regardless of whether this situation started voluntarily, it evolved beyond simple intoxication. She was fully incapacitated and unable to make decisions for herself. And the record contains no evidence as to how Thompson ingested the narcotics leading to the overdose. Beyond that, there is nothing in the definition of "vulnerable adult" that limits the term to exclude voluntary intoxication. *See Molina v. Commonwealth*, 272 Va. 666, 672 (2006) (rejecting an argument that "mental incapacity" in Code § 18.2-67.10(3) should be limited to permanent conditions rather than temporary conditions such as voluntary intoxication because nothing in the statutory definition limits the definition to permanent conditions).

There is nothing in the statute that suggests a temporal limitation. If the General Assembly intended to include such a limitation, it could have done so. *See Phelps v. Commonwealth*, 275 Va. 139, 142 (2008) (concluding that if the General Assembly had intended to make the statute at issue narrower it could have done so); *Coles*, 44 Va. App. at 558 (We assume "the legislature chose, with care, the words it used when it enacted the relevant statute." (quoting *Barr*, 240 Va. at 295)). To the contrary, the General Assembly added language to the provision in 2022, demonstrating an intent to broaden the protection for vulnerable adults. *See* 2022 Va. Acts ch. 259 (adding "or has one or more limitations that substantially impair the adult's ability to independently provide for his daily needs or safeguard his person, property, or legal interests" and replacing "incapacitated adult" with "vulnerable adult").

Fergeson also argues that other statutes using the term "vulnerable adult," and relying on the definition in Code § 18.2-369, support his argument that the General Assembly intended the definition to refer to long-term disabilities rather than intoxication. *See, e.g.*, Code § 18.2-60.5 (prohibiting installation of an electronic tracking device to track someone except for the "legally authorized representative of a vulnerable adult"). These statutes do support an interpretation of "vulnerable adult" that includes adults with long-term disability or conditions. For example, you likely would not need to track someone with a short-term condition. But these statutes do not contain language that limits the definition of the term "vulnerable adult" or otherwise indicates that the term exclusively applies to long-term conditions. Nor does the use of the term in those statutes mean that the circumstances surrounding all vulnerable adults would fit within those statutes.

The plain language of the statute is broad enough to encompass a situation where a person is suffering a temporary impairment due to a severe drug overdose. The intent behind the statute is to protect adults who are vulnerable due to a physical or mental condition that impairs

- 8 -

their ability to make decisions and care for themselves.  Thompson fell within that category at the time of the incident.  Accordingly, we find that the trial court did not err in finding that Thompson qualified as a vulnerable adult.

> 2. Fergeson was a responsible person because he assumed responsibility in fact by his actions.

Fergeson argues that he was not a responsible person under Code § 18.2-369(C) because he did not have responsibility for Thompson by operation of law and he did not assume responsibility for her by contract or in fact.[4]  We disagree.

Code § 18.2-369(C) defines a "responsible person" as "a person who has responsibility for the care, custody, or control of a vulnerable adult by operation of law or who has assumed such responsibility voluntarily by contract or in fact."  Past cases dealing with the "responsible person" provision have involved some form of legal or caretaking relationship.  *See, e.g.*, *Correll v. Commonwealth*, 269 Va. 3 (2005) (daughter appointed legal guardian of mother); *Waggoner v. Commonwealth*, 289 Va. 476 (2015) (owner and president of a group home).  But the plain language of Code § 18.2-369(C) "does not require a familial or judicially sanctioned relationship."  *Williams v. Commonwealth*, No. 1926-08-4, slip op. at 5 (Va. Ct. App. Sept. 15, 2009).[5]  The plain language of the statute sets out three avenues to becoming a "responsible person": (1) legal principles creating that responsibility, (2) a person assuming responsibility via contract, or (3) a person acting in a manner that acknowledges or assumes such responsibility.  *Id.*; *see also Haefele v. Commonwealth*, 75 Va. App. 591, 599 (2022) ("When construing a

---

[4] He also argues that he cannot be a responsible person because there was no vulnerable adult.  Because we have already determined that Thompson was a vulnerable adult, we reject this argument.

[5] "Although not binding precedent, unpublished opinions can be cited and considered for their persuasive value."  *Jones v. Commonwealth*, 71 Va. App. 375, 382 n.2 (2019) (quoting *Otey v. Commonwealth*, 61 Va. App. 346, 350 n.3 (2012)).

statute, our primary objective is 'to ascertain and give effect to legislative intent,' as expressed by the language used in the statute." (quoting *Blake v. Commonwealth*, 288 Va. 375, 381 (2014))).

Here, Fergeson did not have legal responsibility for Thompson under the first two categories. We disagree with his assertion on brief, however, that he did not assume responsibility in fact by his actions.[6] Thompson was unconscious, unresponsive, and barely breathing. Though Fergeson initially tried to leave the scene, he ended up staying and, by his words and conduct, he assumed responsibility for Thompson. He repeatedly told Burrell and Iris to "move away." He attempted to prevent them from calling 9-1-1, and he physically prevented them from providing any kind of assistance. As the trial court noted, Fergeson "made his responsibility clear to others by saying, 'You're not to get near her . . . . Don't call 911.' So not only ha[d] he assumed the responsibility, he ha[d] communicated that loud and clear to the others who are nearby and trying to help." Beyond that, Fergeson communicated to paramedics that he was her boyfriend. While not all situations where a friend or partner are present with a vulnerable adult will lead to an assumption of responsibility, under the particular facts of this case, where Fergeson prevented any kind of assistance and took it upon himself to try and care for Thompson, we find the evidence sufficient to prove that Fergeson voluntarily assumed responsibility for Thompson.

3. Fergeson willfully abused or neglected Thompson.

Fergeson next argues that the evidence was insufficient to prove that he had the requisite intent for abuse and neglect. Because of the nature of his relationship with Thompson and the

---

[6] During oral argument, Fergeson's attorney acknowledged that the Commonwealth had a "good argument" that he assumed responsibility for Thompson by his actions, and he made no argument in response.

- 10 -

history of drug use, he contends that it was "reasonable to assume that [he] did not know the severity" of Thompson's condition.

Code § 18.2-369(C) defines abuse as "knowing and willful conduct that causes physical injury or pain." It defines neglect as "knowing and willful failure by a responsible person to provide treatment, care, goods, or services which results in injury to the health or endangers the safety of a vulnerable adult." Code § 18.2-369(C). "[T]he word 'willful' describes conduct that must be knowing or intentional, rather than accidental, and undertaken without justifiable excuse, without ground for believing the conduct is lawful or with a bad purpose." *Correll*, 269 Va. at 13. Thus, in the context of Code § 18.2-369, "willful" "contemplates an intentional, purposeful act or omission in the care of an incapacitated adult by one responsible for that adult's care." *Id.*

"Intent is the purpose formed in a person's mind and may, like any other fact, be shown by circumstances, including the 'words or conduct' of the alleged offender." *Fary v. Commonwealth*, 77 Va. App. 331, 342 (2023) (en banc) (quoting *Secret v. Commonwealth*, 296 Va. 204, 228-29 (2018)), *aff'd*, 303 Va. 1 (2024). Indeed, "[i]ntent may, and most often must, be proven by circumstantial evidence and the reasonable inferences to be drawn from proven facts are within the province of the trier of fact." *Sarka v. Commonwealth*, 73 Va. App. 56, 67 (2021) (quoting *Fleming v. Commonwealth*, 13 Va. App. 349, 353 (1991)). "In determining a defendant's intent, '[c]ircumstantial evidence is as competent and is entitled to as much weight as direct evidence, provided it is sufficiently convincing to exclude every reasonable hypothesis except that of guilt.'" *Id.* (alteration in original) (quoting *Coleman v. Commonwealth*, 226 Va. 31, 53 (1983)).

Here, the evidence was sufficient to support the trial court's finding that Fergeson acted willfully. Thompson was unconscious, unresponsive, her breathing was shallow, and her lips

were blue. Her carbon dioxide level indicated that she had been in that condition for a "long time." Two bystanders recognized the seriousness of her condition, with one thinking that Thompson was dead. And the bystanders stayed to call for help despite their concerns about Fergeson's behavior. Despite all of this, Fergeson refused to provide aid, refused to allow the bystanders to help, and refused to follow the 9-1-1 operator's instructions. Not only did he refuse to take affirmative action to help her himself, Fergeson actively prevented others from helping Thompson. Though Fergeson claimed that Thompson did this all the time, and argues it was therefore reasonable to assume he did not understand the severity of her condition, the jury rejected his hypothesis of innocence. *See Maust v. Commonwealth*, 77 Va. App. 687, 700-01 (2023) (en banc) ("As long as 'a rational factfinder could reasonably reject [the appellant's] theories in his defense and find that the totality of the suspicious circumstances proved [his guilt] beyond a reasonable doubt,' the appellate court must affirm the conviction." (alterations in original) (quoting *Park v. Commonwealth*, 74 Va. App. 635, 654 (2022))). Here, despite Fergeson's claims, a reasonable factfinder could conclude that Fergeson's conduct constituted an intentional and purposeful act, rather than an accident, and was therefore willful.

C. *The evidence was sufficient to support a conviction for attempted interference with a 9-1-1 call.*

Fergeson argues that the evidence was insufficient to convict him of attempted interference with a 9-1-1 call because he did not have the intent required under Code § 18.2-164. We disagree.

Code § 18.2-164(A)(4) and (B)(1) make it a Class 1 misdemeanor to

> [w]illfully or maliciously prevent, obstruct, or delay by any means or contrivance whatsoever the sending, conveyance, or delivery in the Commonwealth of any authorized communication by or through any telephone or . . . wireless transmission device . . . with the intent to prevent another person from summoning law-enforcement, fire, or rescue services.

"[A]n attempt to commit a crime is composed of the intent to commit it and a direct but ineffectual act done towards its commission." *Meade v. Commonwealth*, 74 Va. App. 796, 810 n.6 (2022) (quoting *Coles v. Commonwealth*, 270 Va. 585, 589 (2005)).

Fergeson contends that the act of telling Burrell not to call 9-1-1 did not constitute an attempt under the statute because it requires "some kind of physical incursion." But "[w]e must presume that the General Assembly chose, with care, the words that appear in a statute, and must apply the statute in a manner faithful to that choice." *Jones v. Commonwealth*, 296 Va. 412, 415 (2018) (quoting *Johnson v. Commonwealth*, 292 Va. 738, 742 (2016)). "When the language of a statute is plain and unambiguous, we are bound by the plain meaning of that statutory language." *Id.* (quoting *Alston v. Commonwealth*, 274 Va. 759, 769 (2007)).

The plain language of this statute is straightforward. It prohibits willfully preventing or delaying a 9-1-1 call "by any means or contrivance whatsoever" if done "with the intent to prevent another person from summoning" emergency services. Code § 18.2-164(A)(4), (B)(1). There is nothing in the language of this statute that requires a physical incursion. *See Alexander v. Commonwealth*, No. 0126-12-4, slip op. at 10 (Va. Ct. App. Apr. 30, 2013) (holding that Code § 18.2-164(B)(2) requires proof that the defendant disabled or destroyed the communication device but noting that Code § 18.2-164(A)(4) prohibits obstructing or delaying without limiting the means of interference). To the contrary, the language broadly encompasses "*any* means or contrivance." Code § 8.01-164(A)(4) (emphasis added).

Here, Fergeson explicitly and repeatedly told Burrell not to call 9-1-1. He repeatedly told Burrell to move away, and Burrell testified that he was concerned for his physical safety because of Fergeson's words and behavior. Given the broad language of the statute, this is sufficient to constitute an attempt to prevent Burrell from calling 9-1-1. Under the circumstances of this case,

- 13 -

the evidence is sufficient to support the conviction for attempted interference with a 9-1-1 call. Accordingly, the trial court did not err.

## III. CONCLUSION

Given the particular facts of this case, we find the evidence sufficient to prove that Fergeson voluntarily assumed responsibility for Thompson, whose condition rendered her a vulnerable adult under Code § 18.2-369. His failure to assist, and his active interference with those trying to help Thompson constituted neglect under the statute. Therefore, the evidence was sufficient to sustain his conviction for abuse or neglect of a vulnerable adult. Further, because the broad language of Code § 18.2-164(A)(4) does not require *physical* interference, the evidence supported his conviction for attempted interference with a 9-1-1 call. Accordingly, we affirm the trial court.

*Affirmed.*